**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

LUCERO XOCHIHUA-JAIMES,

*Petitioner*,

v.

WILLIAM P. BARR, Attorney General,

*Respondent.*

No. 18-71460

Agency No.
A206-105-249

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted March 4, 2020
San Francisco, California

Filed June 26, 2020

Before: EUGENE E. SILER,[*] KIM MCLANE
WARDLAW, and MILAN D. SMITH, JR., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the
U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

**SUMMARY**[**]

**Immigration**

Granting a petition for review of the Board of Immigration Appeals' denial of deferral of removal under the Convention Against Torture, and remanding, the panel held that the evidence compelled the conclusion that petitioner would more likely than not be tortured, with the consent or acquiescence of a public official, if returned to Mexico.

The panel held that the Board misapplied Ninth Circuit precedents regarding acquiescence of a public official and the possibility of safe relocation, and relied on factual findings that are directly contradicted by the record, in concluding that petitioner failed to meet her burden to establish that she would more likely than not be tortured. Specifically, the panel held that the Board erred by relying on national efforts to combat drug cartels in concluding that petitioner failed to establish acquiescence. Considering petitioner's testimony regarding multiple instances of acquiescence in the past involving her personal circumstances, and extensive country conditions evidence documenting the widespread problem of public official acquiescence in crimes by Los Zetas cartel generally, the panel held that the record compelled the conclusion that petitioner established the requisite level of acquiescence by public officials. The panel also held that the evidence compelled the conclusion that petitioner could not safely relocate within Mexico to avoid future torture, where there

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

was no affirmative evidence that there is a general or specific area within Mexico where petitioner could safely relocate, and the evidence indicated that Los Zetas operate, and that LGBTQ individuals are at heightened risk, throughout much of Mexico.

The panel held that the evidence compelled the conclusion that it is more likely than not that Los Zetas will target petitioner for murder or other torture if she is removed to Mexico, and remanded for the Board to grant deferral of removal.

## COUNSEL

Max Carter-Oberstone (argued) and Brian Goldman, Orrick Herrington & Sutcliffe LLP, San Francisco, California, for Petitioner.

Rebecca Hoffberg Phillips (argued) and Jessica D. Strokus, Trial Attorneys; Anthony C. Payne, Assistant Director; Joseph H. Hunt, Assistant Attorney General; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

**OPINION**

M. SMITH, Circuit Judge:

Lucero Xochihua-Jaimes, a native and citizen of Mexico, petitions for review of the BIA's denial of her Convention Against Torture (CAT) claim. Petitioner has lived in the United States for almost twenty years, since she fled Mexico as a teenager after being raped multiple times and being ejected from her parents' home because she is a lesbian. Petitioner eventually became involved in an abusive relationship with Luna, a man connected to Los Zetas, one of Mexico's major drug cartels. After Petitioner reported Luna for raping her twelve-year-old daughter in 2013, and Luna went to prison as a result, Luna's family began a campaign of threatening Petitioner that if she ever returned to Mexico, Petitioner and her daughter would be killed. The Immigration Judge (IJ) found that Petitioner did not carry her CAT burden, and the Board of Immigration Appeals (BIA) affirmed. We grant the petition, and hold that Petitioner is entitled to deferral of removal pursuant to CAT.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I. Facts**

Petitioner grew up in Veracruz, Mexico, where she lived with her parents and two siblings.[1] At seven or eight years old, her grandfather and later her cousin began raping her. Her parents did not protect her. After Petitioner came out as

---

[1] The IJ found Petitioner credible, and the BIA did not disturb this finding. Thus, "we accept the facts given by [the petitioner] and all reasonable inferences to be drawn from them as true." *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1075 n.1 (9th Cir. 2015) (quoting *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1054 n.2 (9th Cir. 2006)).

a lesbian, her parents told her that the sexual abuse was happening so she could "learn to be a woman."

In 2001, as a teenager, Petitioner was raped by a schoolteacher and became pregnant with her first child, a daughter we will refer to as I.X. When Petitioner reported the rape to her parents, her parents did not believe her because she had a girlfriend. Soon afterward her father kicked her out of the house. Petitioner fled to the United States and entered without admission or parole.

In 2003, Petitioner met Clemente Leonardo Arias Luna, a Mexican citizen and U.S. lawful permanent resident, in North Carolina. Luna offered, and Petitioner agreed, to enter a "pretend" relationship, in order for Petitioner to regain her parents' approval by appearing to be heterosexual. In 2004, Luna began beating and raping Petitioner. Petitioner would ultimately have five children by him. According to Petitioner, Luna and "all his family" were then, and are still, members of Los Zetas.

Also in 2004, Luna's nephew Chavelo attempted to sexually assault Petitioner. Petitioner reported the assault to the police in North Carolina, who arrested Chavelo. However, when it became evident that Petitioner would be called to testify against Chavelo, Luna moved her to Arizona. Luna used abuse, rape, and taking Petitioner's children away in order to force Petitioner to stay with him, despite her attempts to escape from him. Petitioner also stayed because her relationship with Luna was the only way to keep her parents talking to her—as she said, "they are the only family I have."

In 2005, Petitioner was apprehended by immigration authorities, and agreed to voluntarily return to Mexico. Petitioner's parents refused to take her in, so Petitioner went

to stay with a cousin of Luna's in Baja California, whom Petitioner described as one of Los Zetas' "major heads of the drugs over there." When she arrived, this cousin "beat [her] up very bad," pointed a gun at her head, and told her if she ever left Luna he would kill her. Petitioner testified that onlookers "were all just laughing," and that "the police would drive by, but they wouldn't give me any help. They were just laughing at me."

Petitioner stayed in Baja California for one month while she "wait[ed] for the bruises to go away" and had a surgery for an ectopic pregnancy. Petitioner then re-entered the United States without admission or parole. She lived in a mobile home in Arizona with Luna and her children. She eventually began working cleaning jobs outside the home. Luna continued to abuse her. Petitioner called the police to report Luna multiple times, but she received no help from them.

In 2010, Petitioner became aware that Luna had bribed Mexican officials to put the mother of some of his other children, Isabelle Moreno, in jail. Moreno had reported Luna and his family for threatening her and taking her children, and Luna was able to pay off Mexican police to put Moreno in jail instead of him. Petitioner learned about this incident because Luna made Petitioner help take care of Moreno's children during her incarceration.

Petitioner managed to leave her relationship with Luna in 2012, on the condition that she would allow him to see their children. Although Luna provided no financial support, he agreed to babysit when Petitioner was at work.

In 2013, Luna sexually molested I.X., then twelve years old, while Petitioner was working a night shift. Petitioner filed a police report but the police did not immediately

apprehend Luna because he had fled to California. Luna returned to Petitioner's home a few months later, where he broke down the door, hit Petitioner, and tried to take the children. Petitioner's neighbor called the police but Luna fled again. In March 2014, Luna returned, and a neighbor witnessed Luna sexually molesting I.X. The neighbor called the police, who successfully apprehended Luna. Luna is currently serving a 37-year sentence for sexual conduct with, and molestation of, a child.[2]

At some point after Luna's arrest, police came to Petitioner's home while she was working and a babysitter was watching her children. The babysitter hid because she was afraid of talking to the police due to her immigration status. The police concluded that the children were unsupervised. As a result, Arizona Child Protective Services took Petitioner's children. Petitioner has been trying to regain custody ever since.

After Luna was imprisoned, two of Luna's adult children (a son and a daughter from another relationship, both members of Los Zetas, who live in California) went to Petitioner's home. They put a gun to Petitioner's back, threw her to the floor, and threatened that Petitioner "would pay because their dad was in jail." They threatened that if Petitioner ever returned to Mexico, she and I.X. "would be dead." Petitioner believes they would have taken her children if they had been present at the time. Petitioner received numerous threats thereafter, accompanied by actions such as breaking the windows of her house, cutting the brake fluid lines of her truck, and puncturing her tires. The threats continued to reach her even after she changed her

---

[2] We hereby GRANT Petitioner's motion for judicial notice of Luna's conviction record.

telephone number, and would only worsen when she reported incidents to the police. The threats came from several members of Luna's family, including the same son and daughter who had previously gone to Petitioner's house, as well as Chavelo, Luna's nephew, who tried to sexually assault Petitioner in North Carolina, and who is now in Mexico again after being deported. In light of these threats, Petitioner believes that Luna's Zetas relatives in Mexico would torture and murder both her and I.X. if she were removed.

In 2015, Petitioner met a lawyer who "guarantee[d]" to get her custody of her children again for a $2000 fee. Petitioner's co-worker, Yvette, offered to lend Petitioner the money if Petitioner helped Yvette pick up Yvette's family members. Petitioner agreed and drove behind Yvette to "the middle of nowhere," where three armed strangers entered Petitioner's vehicle and yelled at her to drive fast. Petitioner refused, driving so slowly that she got pulled over by police. The strangers fled before police could apprehend them. Petitioner cooperated fully, and the police found nothing in Petitioner's vehicle. However, police arrested Yvette and found six backpacks full of marijuana in Yvette's vehicle. Petitioner claims she had not known she was agreeing to help pick up drugs, and that she would not have agreed to help Yvette if she had known. Petitioner fought her case for 11 months before the prosecutor and public defender convinced Petitioner to sign a plea deal for a 2-year sentence for possession of marijuana for sale. The judge sentenced Petitioner to 1.5 years.

When her prison sentence was completed, Petitioner was charged with removal. She petitioned for withholding of removal and CAT protection. Petitioner fears that Los Zetas will find and torture her anywhere in Mexico. She thinks

they will easily find her because of her unique surname. Petitioner believes Los Zetas previously tried to kidnap her brother and sister who still live in Veracruz. Petitioner has received numerous threats from various members of Luna's family who are also Zetas. Petitioner believes that Los Zetas are able to control Mexican police and that the Mexican police therefore will not protect her from Luna, Luna's family, or Los Zetas.

## II. IJ Decision

On consideration of whether Petitioner was eligible for deferral of removal under CAT,[3] the IJ first found that Petitioner's past harms in Mexico did not amount to torture. The IJ found that neither the sexual abuse Petitioner suffered in Mexico as a child or teenager, nor the mental suffering she experienced as a result of her parents' reaction to her sexual orientation, constituted torture.

The IJ then found that, even assuming Petitioner's past harm did amount to torture, Petitioner failed to establish that she would more likely than not be tortured if removed to

---

[3] The IJ concluded that Petitioner was not eligible for withholding of removal because her conviction for possession of marijuana for sale qualified as a "particularly serious crime." The IJ determined that A.R.S. § 13-3405(A)(2), which makes it a crime to "knowingly possess marijuana for sale," was a categorical match for a felony under the federal Controlled Substances Act, 21 U.S.C. §§ 841(a)(1), (b)(1)(D). The IJ also determined that the offense was an aggravated felony "drug trafficking crime." *See* INA § 101(a)(43)(B). Applying *Matter of Y-L-*, 23 I. & N. Dec. 270, 276–77 (A.G. 2002)—which holds that a drug trafficking crime is a particularly serious crime except under "extraordinary and compelling circumstances," which must include that only a "very small quantity" of drugs was involved—the IJ concluded that Petitioner's conviction was a particularly serious crime. The validity of this determination is not before us.

Mexico. The IJ acknowledged Petitioner's evidence of mistreatment of LGBTQ individuals and of cartel violence generally, but stated that country reports "do not necessarily show that a particular person would be in danger of being subjected to torture upon his or her return to that country. Instead, specific grounds must exist to indicate that the applicant will be personally at risk of torture."

The IJ concluded that Petitioner had not demonstrated that she would be "personally at risk of torture." The IJ reasoned that no one in Mexico besides Petitioner's family knows about her sexual orientation. The IJ also reasoned that Petitioner's testimony about Luna and his family's connection to Los Zetas was "speculative," and "it [was] unclear how she knows this still to be true." Although acknowledging Petitioner's testimony that the cousin of Luna's who harmed her in 2005 was then connected to Los Zetas, the IJ faulted Petitioner for "fail[ing] to provide specific testimony or evidence of any current connections between [Luna's] family and the Zetas."

The IJ additionally concluded, "[b]ased on the evidence of record," that Petitioner "could reasonably avoid the harm she fears by relocating to another part of Mexico." The IJ reasoned that Petitioner was at risk only in Baja and Veracruz, and that Zetas members other than Luna's family would be unlikely to recognize Petitioner elsewhere. The IJ "accord[ed] little weight to the applicant's unsubstantiated opinion that the Zetas cartel is present throughout all of Mexico and would identify her based on the 'peculiarity' of her last name." The IJ found that Los Zetas operate only "within the state of Veracruz and surrounding areas." The IJ then reasoned that, "Mexico is a large country with millions of inhabitants. It seems unlikely that there is

nowhere in Mexico that the applicant could live without being harmed." The IJ concluded that:

> [T]he applicant need not attempt to live in every single Mexican state to demonstrate the impossibility of relocation, because that would not be feasible. However, having never attempted to move in Mexico, but merely speculating that [Luna] has connections throughout the entire country, does not provide sufficient evidence to determine that relocation is impossible in the applicant's case.

Finally, the IJ concluded that, "even if the applicant could establish that it is more likely than not that she would be tortured in Mexico, . . . there is no basis for concluding the Mexican government and its officials would participate in torturing the applicant either actively or by willful blindness." The IJ reasoned that, "[d]espite its evident problems, the Mexican government does not, as an entity, practice, condone, or willfully acquiesce in torture. . . . Admittedly, there have been a number of incidents of alleged torture by members of law enforcement; however, the Mexican government has demonstrated its commitment to eradicating such behaviors."

## III.   BIA Decision

The BIA affirmed the IJ's alternative holding[4] that "even if the applicant's past mistreatment amounted to torture, she

---

[4] The BIA did not affirm the IJ's finding that Petitioner failed to establish past torture. The BIA acknowledged that Petitioner testified to "traumatic past events" and that "[r]ape can constitute torture . . . [as it]

did not establish that she will more likely than not be tortured if returned to Mexico."**5**

The BIA concluded that Petitioner had provided insufficient evidence "to establish that she would more likely than not be targeted by any criminal element or any other person in Mexico." The BIA affirmed the IJ's findings that no one outside of Petitioner's immediate family knows about her sexual orientation, that Petitioner's family would not torture her, that Petitioner's testimony about Luna's connections to Los Zetas was "speculative," and that the country conditions evidence did not show that Petitioner would be personally at risk.

The BIA affirmed the IJ's determination that Petitioner could reasonably relocate to avoid the harm she fears. The BIA affirmed the IJ's findings that Petitioner's opinion that Los Zetas are present throughout Mexico was "unsubstantiated," that Petitioner had not had interactions with Los Zetas apart from Luna's family members, and that Los Zetas operate "within the state of Veracruz and surrounding areas." The BIA held that "[t]he applicant's speculation that [Luna] has country-wide connections in Mexico, coupled with the lack of any attempt to relocate, does not provide adequate evidence to conclude that relocation is not a reasonable option." The BIA also found that country conditions evidence did not establish that

---

is a form of aggression constituting an egregious violation of humanity." *Avendano-Hernandez*, 800 F.3d at 1079.

**5** The BIA noted that Petitioner waived any challenge to the IJ's finding that she was ineligible for withholding of removal given her conviction for a particularly serious crime.

Petitioner was more likely than not to be tortured in all areas of Mexico simply as an LGBTQ individual.

The BIA affirmed the IJ's determination that Petitioner failed to establish consent or acquiescence by a public official. The BIA stated that "[t]he fact that there are corrupt police officials does not mean that the government consents or acquiesces in the torture of its citizens." The BIA approved the IJ's reasoning that "the Mexican government is aggressively combating corruption, drug cartels, and violence against members of the LGBT" community. The BIA rejected Petitioner's argument that the 2005 incident demonstrated acquiescence by public officials where the police drove by and laughed, because "[t]his incident, which is not described with much detail, is insufficient . . . in light of . . . more recent country conditions evidence."[6]

## JURISDICTION AND STANDARD OF REVIEW

We review for substantial evidence the factual findings underlying the BIA's determination that an applicant is not eligible for CAT protection. *Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1078 (9th Cir. 2015). "In order for this court to reverse the BIA with respect to a finding of fact, the evidence must compel a different conclusion from the one reached by the BIA." *Zheng v. Holder*, 644 F.3d 829, 835 (9th Cir. 2011). "[W]e review *de novo* both purely legal questions and mixed questions of law and fact." *Cordoba v. Holder*, 726 F.3d 1106, 1113 (9th Cir. 2013) (quoting

---

[6] The BIA also rejected Petitioner's due process challenge. Because we conclude herein that Petitioner has proven her CAT claim, we do not reach her due process claim.

*Mendoza-Pablo v. Holder*, 667 F.3d 1308, 1312 (9th Cir. 2012)).

## ANALYSIS

Substantial evidence does not support the BIA's determination that Petitioner failed to meet her burden of proof under CAT that she would more likely than not be tortured, with the consent or acquiescence of a public official, if returned to Mexico.  The BIA reached its determination by misapplying our precedents regarding acquiescence of a public official and regarding the possibility of safe relocation, as well as by making or affirming factual findings that are directly contradicted by the record.  Contrary to the BIA's determination, we hold that the existing record compels the conclusion that Petitioner has met her burden under CAT.

To be eligible for relief under CAT, an applicant bears the burden of establishing that she will more likely than not be tortured with the consent or acquiescence of a public official if removed to her native country.  *Avendano-Hernandez*, 800 F.3d at 1078–79.  "Torture is an extreme form of cruel and inhuman treatment and does not include lesser forms of cruel, inhuman or degrading treatment or punishment that do not amount to torture."  8 C.F.R. § 1208.18(a)(2).  The threat of imminent death, whether directed at the applicant or someone the applicant knows, may constitute torture.  *See id.* §§ 1208.18(a)(4)(iii)–(iv).  Rape and sexual assault may constitute torture, and "certainly rise[] to the level of torture for CAT purposes" when inflicted due to the victim's sexual orientation. *Avendano-Hernandez*, 800 F.3d at 1079.

In evaluating a CAT claim, "the IJ must consider all relevant evidence; no one factor is determinative."

*Maldonado v. Lynch*, 786 F.3d 1155, 1164 (9th Cir. 2015) (en banc). Relevant evidence includes:

> (i) Evidence of past torture inflicted upon the applicant;
>
> (ii) Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
>
> (iii) Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
>
> (iv) Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 1208.16(c)(3). "CAT claims must be considered in terms of the aggregate risk of torture from all sources, and not as separate, divisible CAT claims." *Quijada-Aguilar v. Lynch*, 799 F.3d 1303, 1308 (9th Cir. 2015).

## I. Acquiescence of a Public Official

"Acquiescence of a public official requires that the public official, prior to the activity constituting torture, have awareness of such activity and thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). "Government acquiescence does not require actual knowledge or willful acceptance of torture; awareness and willful blindness will suffice." *Aguilar-Ramos v. Holder*, 594 F.3d 701, 705–06 (9th Cir. 2010). However, "a general ineffectiveness on the government's part to investigate and prevent crime will not suffice to show acquiescence." *Andrade-Garcia v. Lynch*, 828 F.3d 829, 836 (9th Cir. 2016).

In *Madrigal v. Holder*, 716 F.3d 499 (9th Cir. 2013), we considered an asylum and CAT case specifically involving Los Zetas in Mexico. Regarding the relationship between public officials and Los Zetas, we said:

> Significant evidence in the record calls into doubt the Mexican government's ability to control Los Zetas. The available country conditions evidence demonstrates that violent crime traceable to drug cartels remains high despite the Mexican government's efforts to quell it. . . . Furthermore, notwithstanding the superior efforts of the Mexican government at the national level, corruption at the state and local levels "continue[s] to be a problem." Many police officers are "involved in kidnapping, extortion, or providing protection for, or acting directly on behalf of, organized crime and drug traffickers," which leads to the "continued reluctance of many victims to file complaints." . . . [C]orruption is also rampant among prison guards, and [Zetas] prisoners can and do break out of prison with the guards' help.

*Id.* at 506–07 (citations omitted) (quoting U.S. Dep't of State, 2008 Human Rights Report: Mexico (2009)). As to acquiescence for CAT purposes, we said:

> Importantly, an applicant for CAT relief need not show that the entire foreign government would consent to or acquiesce in his torture. . . . Voluminous evidence in the record explains that corruption of public

officials in Mexico remains a problem, particularly at the state and local levels of government, with police officers and prison guards frequently working directly on behalf of drug cartels. . . . "[I]t is not contrary to the purpose of the CAT . . . to hold Mexico responsible for the acts of its officials, including low-level ones, even when those officials act in contravention of the nation's will."

*Id.* at 509–10 (quoting *Ramirez-Peyro v. Holder*, 574 F.3d 893, 901 (8th Cir. 2009)).

In *Barajas-Romero v. Lynch*, 846 F.3d 351 (9th Cir. 2017), a case involving another drug cartel in Mexico, we further clarified the standard we applied in *Madrigal*. *See id.* at 354, 363. The BIA had reasoned that "the danger [the petitioner] faced from the drug cartel and corrupt police did not establish government involvement because Mexican law, and national policy to root out the corruption, established the absence of official acquiescence." *Id.* at 363. In other words, the BIA reasoned that acquiescence by "rogue" public officials is not enough. *See id.* We rejected BIA's "rogue official" exception as inconsistent with *Madrigal*. *Id.* To the contrary, a rogue public official is still a "public official" under CAT.

We emphasized this point again in *Bringas-Rodriguez v. Sessions*, 850 F.3d 1051 (9th Cir. 2017) (en banc), a case involving a Mexican applicant who was physically and sexually abused by family members and a neighbor during his childhood and teenage years because of his perceived sexual orientation. *See id.* at 1056. Applying the related asylum standard that asks whether a government is "unable

or unwilling to control" a persecutor, we stressed that high-level government efforts, however important and laudable, do not necessarily reflect low-level government actors on the ground. *See id.* at 1072. We specifically recognized the difficulties that the national Mexican government has had in controlling violence against LGBTQ individuals and in controlling drug cartels, in part because state and local officials are among the perpetrators and are involved with the cartels. *See id.* (citing *Avendano-Hernandez*, 800 F.3d at 1081; *Madrigal*, 716 F.3d at 507); *id.* at 1074–75.

Although the BIA cited *Barajas-Romeros* in its decision here, its interpretation of the facts still suffered from the same mistake we identified in *Madrigal*, *Barajas-Romeros*, and *Bringas-Rodriguez*. Both the IJ and the BIA relied on national efforts to combat drug cartels and the corruption of public officials in order to find that "the government" would not acquiesce in any torture Petitioner might suffer. Yet the record compels the conclusion that the corruption of public officials remains a problem, including specifically with regard to Los Zetas.[7] The BIA even admitted that "there are corrupt officials."

---

[7] There is extensive record evidence that many public officials acquiesce in, if not actively further, the unlawful actions of Los Zetas, and that Los Zetas commit torture:

The 2016 State Department report states that "from 2009 to 2012, the Zetas transnational criminal organization, allegedly in collusion with police, carried out mass disappearances." The report also states that "police, particularly at the state and local level, were involved in kidnapping, extortion, and providing protection for, or acting directly on behalf of, organized crime and drug traffickers."

A 2017 *Dallas Morning News* article stated that, "The internal fracturing of Mexico's once mighty criminal groups, including the Zetas,

In addition to the extensive country conditions evidence indicating the prevalence of acquiescence by public officials in the torture committed by Los Zetas generally, Petitioner testified that she was personally beaten severely and threatened with death at gunpoint by a member of Los Zetas, while Mexican police officers looked on and did not nothing but laugh. This testimony, which the IJ found credible, establishes the acquiescence of public officials in a past instance of torture. *Cf. Bringas-Rodriguez*, 850 F.3d at 1074 (Mexican police laughed at petitioner's gay friend who reported sexual abuse).[8] The BIA erred in concluding that Petitioner's testimony about this incident was insufficient in

---

have led to soaring violence here [in Nuevo Laredo] and across the country . . . [V]iolence has been fueled by fractures within the long-dominant Zetas, now split into two warring gangs . . . . Widespread corruption within Mexican government and security forces, and impunity, is also spreading the lawlessness."

A 2017 *Independent* article reported that Los Zetas murdered a woman whose daughter was kidnapped and murdered by Los Zetas five years prior. The woman had provided police with information that allowed them to capture her daughter's killers, and had founded a support group for parents of missing children.

A 2012 *LA Times* article reported that Los Zetas use particularly horrific methods. The article reported on Los Zetas mutilating 49 people and piling their bodies—with heads, hands, and feet missing—by the side of the road leading to the U.S. border. The article stated that "[t]he Zetas were built with deserters from the Mexican army's elite airborne special forces and then augmented by hardened commandos from Guatemala's Kaibiles, a notorious military unit trained by US advisors."

[8] Even if we credit Respondent's argument that Petitioner's testimony was ambiguous as to whether the police officers participated in the laughter of other onlookers, Petitioner's testimony is not ambiguous as to the most relevant point: Mexican police officers observed Petitioner being assaulted and threatened at gunpoint and did nothing to help her. *See Avendano-Hernandez*, 800 F.3d at 1079 n.2.

light of more recent country conditions evidence. As explained above, the country conditions evidence shows that corruption of government officials, especially of the police with regard to drug cartels, and specifically with regard to Los Zetas, remains a major problem in Mexico. The country conditions evidence certainly does not indicate that low-level government corruption has been so rectified  as to render insufficient Petitioner's testimony regarding acquiescence by specific police officers in Petitioner's specific circumstances.

Furthermore, Petitioner testified, and the IJ credited her testimony, that Luna was able to bribe Mexican officials in 2010 to put the mother of some of his other children in jail after that mother reported Luna or his family for threatening her and taking her children. This testimony further establishes that there are Mexican officials willing to aid the unlawful behavior of Luna, Luna's relatives, and other Zetas members. This inference is not diminished by the fact that, as the IJ noted, Petitioner does not know if the mother is still in jail.

In summary, the record compels the conclusion that Petitioner has established the requisite level of acquiescence by public officials to satisfy that aspect of her CAT claim. She testified to multiple instances of such acquiescence in the past involving her personal circumstances, and presented extensive country conditions evidence documenting the widespread problem of public official acquiescence in Zetas crimes generally.

## II. Evidence that the Applicant Could Safely Relocate

Among its assessment of "*all evidence* relevant to the possibility of future torture," the IJ must consider "[e]vidence that the applicant could relocate to a part of the

country of removal where he or she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii) (emphasis added). The regulation "does not place a burden on an applicant to demonstrate that relocation within the proposed country of removal is impossible." *Maldonado*, 786 F.3d at 1164 (overruling prior cases suggesting otherwise). Nor, however, "do the regulations shift the burden to the government[,] because they state that the applicant carries the overall burden of proof." *Id.* Instead, the IJ must simply "consider all relevant evidence; no one factor is determinative." *Id.*

Although the BIA cited *Maldonado* here, and neither the IJ nor the BIA expressly stated that the burden was on Petitioner to prove impossibility of relocation, their analyses strongly indicate that they applied this reasoning anyway. The BIA concluded that the IJ "found an *absence* of evidence indicating that the applicant could *not* relocate" (emphases added). The IJ stated that "Mexico is a large country" and "[i]t seems unlikely that there is nowhere in Mexico that the applicant could live without being harmed." Neither the IJ nor the BIA cited any affirmative "[e]vidence that [Petitioner] could relocate to a part of [Mexico] where . . . she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii); *cf. Singh v. Whitaker*, 914 F.3d 654, 661 (9th Cir. 2019) (under related relocation inquiry in asylum context, the BIA must conduct an "individualized analysis" to determine whether "there are one or more general or specific areas within the petitioner's country of origin where he has no well-founded fear of persecution and where it is reasonable to relocate"); *Barajas-Romeros*, 846 F.3d at 364 (noting that the State Department country report did not "identify a safe place for individuals who have become targets of drug cartels and the police").

Moreover, contrary to the IJ's and BIA's findings, extensive record evidence shows that Los Zetas operate in many parts of Mexico, including states far away from "Veracruz and surrounding areas." The 2016 State Department Report and other articles in the record cite torture, kidnappings, and murders by Los Zetas in numerous states throughout Mexico. Petitioner testified that Luna's family is in Baja California and that these family members include prominent Zetas members.[9] We recognized in *Madrigal* that Los Zetas had beheaded Petitioner's fellow soldiers in Jalisco who were involved in arresting Zetas members, then tracked down Petitioner to a remote village in which he was hiding. 716 F.3d at 502. Neither the IJ nor the BIA cited any evidence that there are states in Mexico where Los Zetas are unable to operate.

Even if Los Zetas did not find her, Petitioner is at heightened risk throughout Mexico on account of her sexual orientation. Extensive record evidence demonstrates that LGBTQ individuals are at risk throughout Mexico. *See also Bringas-Rodriguez*, 850 F.3d at 1072 (Mexico has actually experienced "an *increase* in violence against gay, lesbian, and transgender individuals during the years in which greater legal protections have been extended to these communities.") (quoting *Avendano-Hernadez*, 800 F.3d at 1081). We have rejected reasoning such as the IJ employed here, that an applicant can be deemed able to safely relocate based on hiding her fundamental identity. *See, e.g.*, *Edu v. Holder*, 624 F.3d 1137, 1146 (9th Cir. 2010) (rejecting BIA's conception that CAT protection requires

---

[9] Neither the IJ nor the BIA provided a cogent reason for concluding that Petitioner's testimony regarding Luna's Zetas connections was merely "speculative," especially considering that she was in a relationship with Luna for nearly a decade.

alien to give up practice of political beliefs in order to avoid torture); *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (recognizing that sexual orientation is "so fundamental to one's identity that a person should not be required to abandon" it), *overruled on other grounds by Thomas v. Gonzales*, 409 F.3d 1177 (9th Cir. 2005) (en banc), *vacated by* 547 U.S. 183 (2006). Although in some circumstances the generalized risk due to Petitioner's LGBTQ identity may not meet the more-likely-than-not standard on its own, it weighs against a conclusion that there is "evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured." 8 C.F.R. § 1208.16(c)(3)(ii). Moreover, "CAT claims must be considered in terms of the aggregate risk of torture from all sources." *Quijada-Aguilar*, 799 F.3d at 1308.

In summary, we conclude that the lack of affirmative evidence that there is a general or specific area within Mexico where Petitioner can safely relocate, the evidence that Los Zetas operate throughout much of Mexico, and the evidence that LGBTQ individuals are at heightened risk throughout Mexico, together compel a conclusion contrary to the BIA's. Although not determinative on its own, *see Maldonado*, 786 F.3d at 1164, the evidence relating to the possibility of relocation weighs in favor of granting Petitioner relief.

## III. Future Torture

The ultimate inquiry in evaluating whether an applicant is entitled to CAT relief is whether, upon consideration of all relevant evidence relevant, the applicant has met her burden to establish that it is more likely than not that she will suffer future torture if removed to the proposed country of removal. 8 C.F.R. §§ 1208.16(c)(2)–(3).

"'[P]ast torture is ordinarily the principal factor on which we rely when an applicant who has been previously tortured seeks relief under the Convention' because, absent changed circumstances, 'if an individual has been tortured and has escaped to another country, it is likely that [s]he will be tortured again if returned to the site of h[er] prior suffering.'" *Avendano-Hernandez*, 800 F.3d at 1080 (quoting *Nuru v. Gonzales*, 404 F.3d 1207, 1217 (9th Cir. 2005)). The rapes Petitioner suffered as a child and teenager, and her parents' reactions to those rapes (either telling Petitioner she deserved it, not believing her, or ejecting her from the house), demonstrate some likelihood that Petitioner is at risk of future torture, particularly in the form of sexual abuse, based on her gender and sexual orientation. *See Avendano-Hernandez*, 800 F.3d at 1079; *cf. Bringas-Rodriguez*, 850 F.3d at 1076 n.18 (recognizing that a presumption of future harm arises where harm can be expected on account of the same reason, such as sexual orientation). Likewise, the 2005 beating and death threat Petitioner suffered from a prominent Zetas member and cousin of Luna's demonstrates some likelihood that she would again suffer severe assault or indeed, as she has now left Luna, death, if that cousin or his Zetas associates were to find her in Mexico.

Furthermore, Petitioner's credible testimony that the conditions in Mexico remain the same compels the conclusion that it is more likely than not that Los Zetas will target Petitioner for murder or other torture if she is removed to Mexico. Petitioner testified that she received death threats from Luna's Zetas relatives and was subject to repeated intimidation tactics for reporting the rape of her daughter and then for reporting the threats themselves. Petitioner testified that the individuals threatening her include Chavelo, Luna's nephew who tried to sexually assault Petitioner in 2004, who is currently living in Mexico after being deported and

working with Luna's uncles and cousins in Mexico. Petitioner also testified that Los Zetas tried to kidnap her siblings who are still in Veracruz.

As discussed above, the record also includes extensive evidence that LGBTQ individuals are subject to a heightened risk of torture throughout Mexico.

Considering all relevant evidence, we conclude that the record compels the conclusion that petitioner has met her burden of proof to establish that it is more likely than not that she will suffer future torture if removed to her native country.

## CONCLUSION

We grant the petition and remand for the agency to grant deferral of removal pursuant to CAT because the record compels the conclusion that Petitioner will more likely than not be tortured if she is removed to Mexico. *See Haile v. Holder*, 658 F.3d 1122, 1133 (9th Cir. 2011) ("Because the evidence Haile presents compels but one conclusion and is unrebutted, there is no reason to remand in this case—we hold that Haile is entitled to deferral of removal under the CAT.").

**PETITION GRANTED.**