FILED
United States Court of Appeals
Tenth Circuit

December 14, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JOACHIM O. ADDO,

     Petitioner,

v.

WILLIAM P. BARR, United States
Attorney General,

     Respondent.

No. 18-9560

_____

**Appeal from the Board of Immigration Appeals
(Petition for Review)**
_____

Kari E. Hong, Boston College Law School, Newton, MA on behalf of Petitioner.

Scott Stewart, Deputy Assistant Attorney General, U.S. Department of Justice
Civil Division, Washington, D.C., (Joseph H. Hunt, Assistant Attorney General, Greg D.
Mack, Senior Litigation Counsel, Terri J. Scadron, Assistant Director, United States
Department of Justice, Civil Division, Office of Immigration Litigation, Washington,
D.C on the briefs) on behalf of Respondent.
_____

Before **HARTZ**, **PHILLIPS**, and **CARSON**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Petitioner Joachim Addo is a native and citizen of Ghana. The Board of

Immigration Appeals (BIA) affirmed the denial by an immigration judge (IJ) of his

application for asylum, withholding of removal,[1] and protection under the Convention

Against Torture (CAT).  In the briefs on his petition for review by this court, he

challenges the denial of asylum and withholding of removal, arguing that substantial

evidence does not support the BIA's determination that he could successfully avoid

future persecution by relocating within Ghana.[2]  Exercising jurisdiction under 8 U.S.C.

§ 1252(a), we agree with Petitioner that the decision on his ability to safely relocate is

unsupported by substantial evidence.  We grant the petition for review and remand to the

BIA for further proceedings.

## I.      BACKGROUND

### A.      Factual Background

---

[1]  "Congress changed the statutory language of the [Immigration and Nationality Act] to 'restriction on removal,' but the corresponding regulations retain the old phrase 'withholding of removal.'"  *Uanreroro v. Gonzales*, 443 F.3d 1197, 1200 n.1 (10th Cir. 2006) (citing 8 U.S.C. § 1231(b)(3) and 8 C.F.R. § 208.16(b)).  Because the parties, the BIA, and the IJ all refer to "withholding of removal," we will use that term as well.

[2]  In this court Petitioner has not presented any argument challenging the ruling against him on his CAT claim, so he has waived the issue.  *See Sawyers v. Norton*, 962 F.3d 1270, 1286 (10th Cir. 2020) ("Issues not raised in the opening brief are deemed abandoned or waived . . . [as are] arguments that are inadequately presented . . . ." (internal quotation marks omitted)).

Petitioner's briefs also rely on *Pereira v. Sessions*, 138 S. Ct. 2105 (2018), to argue that because the notice to appear sent to him by the Department of Homeland Security failed to state the time and date of his first removal hearing, the immigration court had no jurisdiction to order him removed.  But after the briefing was completed this court rejected the same arguments in cases brought by other immigration petitioners.  *See Martinez-Perez v. Barr*, 947 F.3d 1273, 1277–79 (10th Cir. 2020); *Lopez-Munoz v. Barr*, 941 F.3d 1013, 1017–18 (10th Cir. 2019).  Petitioner did not pursue the issue at oral argument, nor need we here.

In January 2017 Petitioner entered the United States. He expressed a fear of returning to Ghana and was granted a credible-fear interview. An asylum officer determined that Petitioner was credible and referred his case to adjudication.

At a hearing in June 2017 the IJ determined that Petitioner was removable. Petitioner indicated, however, that he wished to apply for asylum, so the IJ scheduled a hearing to consider the asylum claim. Petitioner filed an application for asylum, withholding of removal, and protection under the CAT. He relied on the following evidence:

Petitioner is the son of the chief of the Challa tribe. The tribe is small, with a population of about 4000. It is based in and around the town of Nkwanta, in eastern Ghana near the border with Togo. For several years the Challa have been in a land dispute with another tribe, the Atwode.[3]

The Atwode tribe is larger than the Challa, with 10,000 to 15,000 members. But the Challa control more land in the Nkwanta district, and in the past they often leased land to the Atwode. Starting in 2005 the Atwode began violating the lease terms and customs. Petitioner's father therefore instructed the Challa to stop leasing land to the Atwode, and he took the Atwode to court over the land disputes, winning every case. The Atwode responded with violence against the Challa and vowed to eliminate Petitioner's father and family. This led to several violent incidents perpetrated by the Atwode against Petitioner and other members of his family, which we summarize here.

---

[3] Portions of the record refer to the Atwode as the "Akyode." For clarity we use the spelling "Atwode" throughout this opinion.

In 2012 six Atwode men stopped Petitioner at gunpoint in Nkwanta and beat him with sticks, breaking his legs. The men told Petitioner that they wanted to cripple him so that he could not lead the Challa in the future. The next day, Petitioner's two brothers were attacked by the Atwode while on their way to visit Petitioner. One brother suffered a broken collarbone and internal bleeding, the other a slashed cheek.

About two months later the Atwode attacked Petitioner's father in his home. They attempted to shoot him, but the gun failed. Petitioner's father reported the attack to the police, who arrested the gunman. In retaliation for the arrest, several members of the Atwode went to the home of Petitioner's father, where they destroyed property and threatened to behead Petitioner's father. The police did not respond, but members of the military who were in the area intervened to protect Petitioner's father.

Shortly after these attacks, Petitioner and his father agreed that, for his own safety, Petitioner would relinquish his position as heir-apparent to the Challa chiefdom and would move from Nkwanta to Accra, the capital of Ghana. But this did not stop the Atwode. In August 2014 several Atwode men showed up at Petitioner's home in Accra. When Petitioner's wife said that he was not at home, the men beat her. They told her to "tell [Petitioner] to advise his father to stop taking our people to court." Certified Administrative Record (CAR) 484 (internal quotation marks omitted). In response to this attack Petitioner moved to a different part of Accra, but after moving he received a text message saying that the Atwode knew his new address and that moving would not help him.

4

In November 2014 the Atwode assassinated Petitioner's uncle. That same day, Atwode men came to Petitioner's home in Accra. His wife, trying to mislead the men, said that Petitioner was on his way back to Nkwanta. The Atwode then burned down Petitioner's house in Nkwanta.

Petitioner and his brothers continued to receive death threats via phone calls and text messages. In June 2016 Petitioner moved again, but the threats continued and became significant enough that Petitioner and his brothers began thinking about leaving Ghana. An example of these threats, documented in a police report filed by one of Petitioner's two brothers, is a text message telling the brother that "if you don't stop aiding [your father], we w[ill] bath[e] you with acid. We are monitoring you and would locate you anywhere you go." CAR 453. In response to these escalating threats, Petitioner's wife left Ghana for Kenya in September 2016, and his two brothers left the country in December 2016 and January 2017. One brother went to the Ivory Coast and the other moved to Benin.

In the middle of one night in late January 2017, when Petitioner was already preparing to leave Ghana, two gunshots were fired into his bedroom. He inferred that members of the Atwode had fired the shots because of death threats he received from the Atwode via text message. He escaped harm because at the time of the shooting he was in another room taking care of an ill son. Immediately after this incident Petitioner left Ghana. He took his children to Togo, then went on to the United States himself.

As leader of the Challa tribe, Petitioner's father continues to live in Nkwanta. A number of Challa tribesmen, including retired members of the military, live with

Petitioner's father to provide him with constant protection. Petitioner's mother and six of his sisters also remain in Ghana, the sisters in Accra.

## B. Procedural History

The IJ denied Petitioner's application for asylum, withholding of removal, and protection under the CAT. Although the IJ found Petitioner credible, the IJ concluded that he had failed to show that he was persecuted on the basis of a protected ground because he had not proved that his father was the leader of the Challa tribe. Petitioner appealed to the BIA, which determined that Petitioner had sufficiently proved that his father was chief. The BIA explained that Petitioner was therefore entitled to a presumption that he had a well-founded fear of future persecution. It remanded the case to the IJ to assess whether the government could rebut this presumption by showing that Petitioner could safely and reasonably relocate within Ghana.

On remand the Department of Homeland Security (DHS) submitted the following additional evidence to prove that Petitioner could relocate within Ghana: (1) a profile of Ghana from an organization called the Joshua Project containing information about the population of different tribal groups within the country; (2) a World Factbook entry containing information about Ghana's population, ethnic breakdown, and geography; (3) a profile of the Atwode tribe stating that the tribe is based in the Nkwanta district and that some members migrate to other parts of Ghana, "especially to Accra, Kumasi and the larger towns of the Volta region," CAR 111; and (4) a letter from a researcher at the Library of Congress that discusses Nkwanta, including the region's history of ethnic

6

conflict, and states that there is no information suggesting any legal impediment to internal relocation within Ghana.

The IJ again denied Petitioner's application for asylum, withholding of removal, and protection under the CAT, ruling that the government had met its burden to establish that Petitioner could successfully relocate within Ghana. He again appealed the IJ's decision on all three forms of relief. The BIA dismissed the appeal on the ground "that any presumption of future persecution has been rebutted by evidence demonstrating that [Petitioner] could internally relocate." CAR 3. Because it affirmed on that ground, the BIA declined to address Petitioner's other arguments. He then filed this petition for review.[4]

## II. DISCUSSION

### A. Standard of Review

"[W]e review the BIA's decision as the final agency determination and limit our review to issues specifically addressed therein." *Diallo v. Gonzales*, 447 F.3d 1274, 1279 (10th Cir. 2006). But "when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). "This is

---

[4] In July 2020, Petitioner informed the court that he had been removed from the United States and was awaiting the resolution of this appeal from a safe location abroad. We note that Petitioner's removal has not mooted his petition for review because, "in the event this court grants his petition, [Immigration and Customs Enforcement] would facilitate his return to the United States pursuant to its Facilitation of Return Policy." *Igiebor v. Barr*, No. 19-9579, at 9–10 (10th Cir. 2020).

especially appropriate where," as in this case, "the BIA incorporates by reference the IJ's rationale or repeats a condensed version of its reasons while also relying on the IJ's more complete discussion." *Id.*

"We consider any legal questions de novo, and we review the agency's findings of fact under the substantial evidence standard." *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). Under the substantial-evidence standard, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The question whether a noncitizen can avoid future persecution by internally relocating is a factual determination. *See Gambashidze v. Ashcroft*, 381 F.3d 187, 193 (3d Cir. 2004); *Thiam v. Holder*, 555 F. App'x 773, 778 (10th Cir. 2014).

### B.    Asylum

Petitioner argues that there is not substantial evidence to support the BIA's ruling that Petitioner could safely avoid persecution by relocating within Ghana. We agree.

To qualify for asylum, a noncitizen "must demonstrate either past persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Matumona v. Barr*, 945 F.3d 1294, 1300 (10th Cir. 2019) (brackets and internal quotation marks omitted). Where the noncitizen has demonstrated past persecution, he is entitled to a presumption of a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1). The government can rebut this presumption in several ways, including through showing by a preponderance of the evidence that the noncitizen can avoid future persecution by

8

relocating within his country of nationality "and under all the circumstances, it would be reasonable to expect [him] to do so." *Id.* § 1208.13(b)(1)(i)(B), (ii); *see Ritonga v. Holder*, 633 F.3d 971, 976–77 (10th Cir. 2011) ("Fear of persecution is not well-founded if the applicant can avoid persecution by relocating to another part of the country and it would be reasonable to expect her to do so.").

"[B]ecause the purpose of the relocation rule is not to require an applicant to stay one step ahead of persecution in the proposed area, th[e] [new] location must present circumstances that are substantially better than those giving rise to a well-founded fear of persecution on the basis of the original claim." *Matter of M-Z-M-R-*, 26 I. & N. Dec. 28, 33 (BIA 2012). "DHS must demonstrate that there is a specific area of the country where the risk of persecution to the respondent falls below the well-founded fear level." *Id.* at 33–34. In evaluating whether relocation is reasonable, the court considers "whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country; administrative, economic, or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties." 8 C.F.R. § 1208.13(b)(3). [5]

In ruling that the government had met its burden, the BIA stated:

> The [IJ] relied upon the DHS's evidence, especially a 2003 article, which states that the rival [Atwode] tribe does not control the entire country, but is limited to an area of about 190 square kilometers. The [IJ] found that, although [Petitioner] had relocated numerous times within Accra, there had been some infiltration of the [Atwode] into Accra, and [Petitioner] had never attempted "to relocate elsewhere

---

[5] Because reversal is required on the "safety" portion of the relocation inquiry alone, we have no need to consider the reasonableness of relocation.

within Ghana." Thus, the [IJ] reasoned that [Petitioner] could safely and reasonably relocate to a part of the country where the [Atwode] tribe is not in control. These findings are not clearly erroneous.

CAR 4 (citations omitted).  The IJ had provided the following explanation:

> The Court finds that internal relocation is both practically and legally reasonable. Primarily, [Petitioner] was not persecuted by the government or any other national entity. He was harmed by a local group from the Atwode tribe. However, he has not established through credible, direct, and specific evidence that the men who previously attacked him are willing, capable, and inclined to persecute him throughout Ghana. Further, there is no evidence that [Petitioner] has any recognition outside his neighborhood such that he would be unsafe anywhere in the country.
>
> Second, the DHS provided evidence that there are areas within Ghana that are ethnically heterogeneous, meaning [Petitioner] would be able to resettle there without concern of persecution based on his ethnicity. Furthermore, members of [Petitioner's] family continue to live relatively safely in Ghana. Although his parents have been targeted in Nkwanta, [his] sisters remain safely in Accra. Initially, [Petitioner] also relocated to Accra following the first attack; thereafter, he stated that he moved "from place to place," within Accra because the assailants continued to pursue him. Notably, however, [Petitioner] merely relocated within different neighborhoods of Accra without attempting to relocate elsewhere within Ghana. The DHS has provided evidence that demonstrates the tribe [Petitioner] fears, the Atwode, operate within "an area of about 190 square kilometers covering a crescent-shaped chain of villages in the Nkwanta district, Volta Region, near the Togo Border." Some of the tribe's members have also migrated to Accra. However, [Petitioner] testified that the Atwode are not so powerful that they control the entirety of Ghana. In fact, they are a relatively minor tribe, with only 15,000 members compared to other Ghanaian ethnic groups such as the Akan, who comprise 47.5% of the population, or the Mole-Dagbon, who constitute 16.6% of the population. Even in the Nkwanta district, the Atwode are a minority—the predominant groups are the Gurma (50%) and the Ewe (18%). [Petitioner] may relocate to a place outside traditional Atwode control and remain safe, especially since he is no longer the heir apparent of the Challa tribe, which is purportedly why he was being persecuted.

CAR 43–44 (citations omitted).

The analysis of the IJ and BIA is flawed. To begin with, their reliance on the Atwode tribe's small size and limited area of control is misplaced. After all, Petitioner fled Nkwanta to Accra—a city of over two million people located more than 200 miles from the Atwode's traditional area of control around Nkwanta—yet the Atwode tracked him to separate addresses there on several occasions, once assaulting his wife and once being the ones responsible (or so Petitioner could reasonably believe) for shooting into his bedroom. The Atwode's small numbers and localized homeland does not prevent them from operating in parts of the country outside Nkwanta. It does not take many henchmen or control of any territory to assault a few members of one family.

In defense of the agency rulings, the government argues that Petitioner's experiences in Accra have little bearing on whether circumstances for Petitioner would be better in another part of the country, *see M-Z-M-R-*, 26 I. & N. Dec. at 33, because—unlike other parts of Ghana—Accra is a place where the Atwode have "presence or influence." Aplee. Br. at 24. But it points to no evidence that supports this argument. The government fails to explain the character or extent of the Atwode's purported influence, and none of the evidence submitted to the IJ by DHS suggests that they enjoy any influence in Ghana's capital at all.[6] To be sure, the government is correct that

---

[6] Petitioner testified before the IJ that he believed many of the security guards at the Accra airport are Atwode, which, if true, might suggest that the Atwode have some influence in Accra. But because the government asserts that this claim is mere "conjecture," Aplee. Br. at 25 n.9, it cannot rely on Petitioner's testimony as evidence of Atwode influence in Accra.

11

members of the Atwode tribe are present in the capital. Indeed, the profile of the Atwode submitted to the IJ by DHS states that "[s]ome [Atwode] migrate in search of salaried jobs and education, especially to Accra, Kumasi and the larger towns of the Volta region." CAR 111. But even this evidence indicates that Atwode also migrate to other places in Ghana and states only that the named cities are "especially" common destinations. CAR 111. The government has offered no evidence that Atwode are *not* present in other Ghanaian cities to which it would have Petitioner relocate. And more importantly, the government has no evidence linking the Atwode's ability to track and threaten Petitioner in Accra with the "presence" of Atwode migrants in that city. The government has thus failed to satisfy its burden to show that Petitioner's experience in Accra—where he apparently was tracked, threatened, and shot at by Atwode as he moved from address to address—could not be duplicated in other parts of Ghana.

In particular, the IJ, the BIA, and the government all fail to address adequately the threatening text messages sent by the Atwode. As described above, in 2014 after relocating his family to a new part of Accra, Petitioner received a text message telling him that the Atwode knew of his location and that "moving from place to place" would not save him. CAR 484. And in a 2016 text message the Atwode told Petitioner's brother, "We are monitoring you and would locate you anywhere you go." CAR 453. These text messages call into question the IJ's perplexing statement that Petitioner "has not established . . . that the men who previously attacked [Petitioner] are willing, capable, and inclined to persecute him throughout Ghana." CAR 43. (In any event, it was the government's burden to establish a lack of danger to Petitioner, not Petitioner's burden to

12

show danger.) Yet neither the IJ nor the BIA even mentions these threats in their decisions, nor does the government address them in its brief. Without any explanation of why the text messages can be ignored, and with no evidence suggesting that Petitioner's experience in Accra would be unique, the conclusion that the Atwode could not or would not harm Petitioner in the "vast areas of Ghana beyond Accra and the Nkwanta District," Aplee. Br. at 24, finds no support in the record. *See Xochihua-Jaimes v. Barr*, 962 F.3d 1175, 1187 (9th Cir. 2020) (disagreeing with the BIA's conclusion in a CAT case that the applicant could safely relocate within Mexico in part because "[n]either the IJ nor the BIA cited any evidence that there are states in Mexico where Los Zetas are unable to operate"). *Cardenas v. I.N.S.*, 294 F.3d 1062, 1066–67 (9th Cir. 2002) (asylum applicant's receipt of "a direct threat . . . in which [his persecutors] informed him that [they] would get to him wherever he was located," suggested that the applicant could not safely relocate in the country).

The remaining reasons offered by the BIA and the IJ in support of their decisions are even less persuasive. First, the letter from the researcher at the Library of Congress states only that the researcher found nothing indicating that there would be a legal impediment to Petitioner's relocating in Ghana. That letter is irrelevant to the risk presented by the Atwode, who likewise are unrestricted in searching for Petitioner within the country. *See Xochihua-Jaimes*, 962 F.3d at 1187. Also, the IJ supported his decision by noting that "there are areas within Ghana that are ethnically heterogeneous, meaning [Petitioner] would be able to resettle there without concern of persecution based on his ethnicity." CAR 44. But Petitioner was in danger because of his position within his

13

family, not just his ethnicity. Besides, both Accra and Nkwanta are also "ethnically heterogeneous," yet the Atwode attacked Petitioner in both those locations. Living in an "ethnically heterogeneous" location did not protect Petitioner before, and there is no evidence that it would in the future.

The IJ also supported his decision with the observation that "there is no evidence that [Petitioner] has any recognition outside his neighborhood such that he would be unsafe anywhere in the country." IJ Op. at 2–3. But Petitioner did not need to be recognized by the local population to be in danger. Although Petitioner moved 200 miles from his hometown of Nkwanta to Accra, a city of 2.3 million people, and relocated several times within that city, the Atwode were apparently able to track him down after each move. The risk to Petitioner was not that bigoted locals would recognize him as a member of a despised ethnic group; his danger arose from another group's determined (and partially successful) targeting of the men in his family, which did not depend on local recognition.

Next, as the BIA noted, the IJ appears to have faulted Petitioner for "never attempt[ing] 'to relocate elsewhere within Ghana.'" CAR 4 (quoting CAR 44). But "[t]he [U.S. Citizenship and Immigration Services] Asylum Office has [itself] emphasized that '[t]here is no requirement that an applicant first attempt to relocate in his or her country before flight.'" Law of Asylum in the United States § 2:22 at 3 (2020 ed.) (citing *Combined Training Course, Well-Founded Fear*, REFUGEE, ASYLUM, AND INTERNATIONAL OPERATIONS DIRECTORATE, at 28 (Jan. 17, 2019), available at https://www.uscis.gov/sites/default/files/files/nativedocuments/Well_Founded_Fear_LP_

14

RAIO.pdf [perma.cc/RD44-M4V7]); *see also Xochihua-Jaimes*, 962 F.3d at 1182, 1186 (concluding that "[n]either the IJ nor the BIA cited any affirmative [e]vidence that [the petitioner] could relocate" even where the BIA relied on "the lack of any attempt to relocate" by the petitioner). And, of course, after moving from Nkwanta to Accra, Petitioner did relocate several times within Accra in an unsuccessful effort to evade the Atwode. "[T]he purpose of the relocation rule is not to require an applicant to stay one step ahead of persecution." *M-Z-M-R-*, 26 I. & N. Dec. 28, 33.

The IJ's reliance on the fact that Petitioner "is no longer the heir apparent of the Challa tribe," CAR 44, is likewise unreasonable. Petitioner relinquished his right to inherit the chiefdom in 2012, but between that time and when he fled the country in 2017, the Atwode attacked his wife, burned down his house in Nkwanta, sent him death threats, and (Petitioner could reasonably infer) attempted to kill him by shooting into his bedroom. Also, the Atwode assassinated Petitioner's uncle and attacked Petitioner's brothers, none of whom were in the line of succession. The IJ may have viewed Petitioner's abandonment of the right of succession as significant, but the Atwode evidently did not.

Finally, the IJ thought it important that "members of [Petitioner's] family continue to live relatively safely in Ghana. Although his parents have been targeted in Nkwanta, [Petitioner's] sisters remain safely in Accra." CAR 44. But gender equality did not appear to be a priority of the Atwode. They focused on the male members of Petitioner's family—Petitioner himself, his father, his uncle, and his brothers. The safety of his

sisters has little probative value, particularly when their experience in Accra has been so different from his.

On this record we think it was unreasonable for the BIA and the IJ to decide that the government successfully rebutted the presumption that Petitioner has a well-founded fear of future persecution in Ghana. Their finding that Petitioner could safely relocate within Ghana is not supported by substantial evidence. *See Arboleda v. U.S. Atty. Gen.*, 434 F.3d 1220, 1226 (11th Cir. 2006) (concluding that relocation "would not successfully shield [an asylum applicant from] persecution" because, although the applicant "relocated from his farm . . . to the capital city," "the [persecutors] continued to threaten [the applicant] and his family . . . , [including through] frequent notes and telephone calls detailing the family's activities and threatening them with death," and by "burning down [the applicant's] farm house").

## C. Withholding of Removal

To qualify for withholding of removal, a noncitizen must make a showing similar to that required for an asylum claim. The applicant must "establish that his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b). And if it is determined that the applicant suffered past persecution on account of one of the protected grounds, "it shall be presumed that the applicant's life or freedom would be threatened in the future in the country of removal on [that] basis," although the presumption can be rebutted by showing that the applicant could reasonably avoid the threat by relocating internally. *See id.* § 208.16(b)(1)(i); *Rodas-Orellana v.*

16

*Holder*, 780 F.3d 982, 986 (10th Cir. 2015) (describing similar requirements for claims for asylum and withholding of removal). But to qualify for withholding of removal, applicants "must prove a *clear probability* of persecution on account of a protected ground," a higher standard than the "reasonable possibility" showing necessary for asylum claims. *Id.* at 986–87 (emphasis added) (internal quotation marks omitted). Relying on this higher standard, the IJ reasoned that because Petitioner had "failed to prove that he warrants a grant of asylum, . . . it necessarily follows that he has likewise failed to meet the . . . burden of proving that he warrants a grant of withholding of removal." CAR 45. Since we reverse the BIA's decision on Petitioner's asylum claim, we must also reverse and remand to the BIA the withholding-of-removal claim.

## III. CONCLUSION

We **GRANT** the petition for review, **REVERSE** the BIA's decision on Petitioner's asylum and withholding-of-removal claims, and **REMAND** to the BIA for further proceedings consistent with this opinion. We also **GRANT** Petitioner's motion to proceed in forma pauperis.

17