**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| EDGAR G.C., | No. 21-1228 |
| *Petitioner*, | Agency No. A200-694-332 |
| v. | ORDER AND AMENDED OPINION |
| PAMELA BONDI, Attorney General, | |
| *Respondent*. | |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted April 2, 2024
Pasadena, California

Filed July 30, 3034
Amended May 8, 2025

Before: Ryan D. Nelson, Lawrence VanDyke, and Gabriel
P. Sanchez, Circuit Judges.

Order;
Opinion by Judge VanDyke;
Partial Concurrence and Partial Dissent by Judge Sanchez

## SUMMARY[*]

### Immigration

The panel filed (1) an order amending the opinion filed on July 30, 2024, denying a petition for panel rehearing and for rehearing en banc, and indicating that no further petitions will be entertained; and (2) an amended opinion denying G.C.'s petition for review of the Board of Immigration Appeals' decision upholding the denial of withholding of removal and protection under the Convention Against Torture.

G.C. sought withholding of removal and CAT protection based on a risk of future persecution and torture by his father and the Los Zetas cartel, of which his father is a member.

The panel held that the BIA did not abuse its discretion in determining that G.C.'s assault conviction under California Penal Code § 245(a)(4) constituted a particularly serious crime, which rendered him ineligible for withholding relief. Both the IJ and the BIA relied on appropriate evidence in conducting their analyses, including evidence of G.C.'s mental illnesses, and plausibly concluded that G.C.'s mental illnesses did not render the assault a less reliable indicator of G.C.'s dangerousness.

With respect to CAT protection, G.C. contended that the agency erred by wrongly discounting evidence of past harm by his father because such abuse occurred in the United States, not Mexico. G.C. argued that "past torture" must

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

include abuse outside the proposed country of removal because unlike 8 C.F.R. § 1208.16(b)(1)(i), which applies to claims for withholding relief and requires evidence of past persecution in the proposed country of removal, the text of 8 C.F.R. § 1208.16(c)(3)(i) imposes no geographic limitation on past torture for CAT claims. The panel agreed with the government's interpretation of the CAT regulations. Despite the textual difference between the two regulations, the regulatory definition of "torture" requires that the torture must occur with the acquiescence of the government to be actionable under CAT. Thus, a past injury that would otherwise rise to the level of torture in the United States does not fit the regulatory definition of "torture" because such injury did not occur with the acquiescence of the Mexican government. Practically speaking, past harm in the United States says nothing about the likelihood that the Mexican government will acquiesce to severe harm in Mexico. Moreover, while G.C.'s testimony about his father's history of abuse might be some evidence of his father's intent to cause G.C. harm in the future, it says nothing at all about the Mexican government's willingness to acquiesce in such torture. And as the regulatory definition of "torture" makes clear, infliction, instigation, or acquiescence is an element that is required for abuse or harm to qualify as past "torture" under CAT.

The panel also held that substantial evidence supported the agency's findings regarding the likelihood of future torture. Given the passage of time, past unfulfilled death threats, and the lack of clarity regarding G.C.'s father's motives, the record did not compel the conclusion that G.C.'s father would more likely than not seek to torture him upon his return to Mexico.

Concurring in part and dissenting in part, Judge Sanchez agreed that the BIA did not abuse its discretion in concluding that G.C.'s assault conviction was a particularly serious crime. However, Judge Sanchez would find that G.C. is entitled to CAT protection because the uncontroverted evidence, including extensive country conditions and expert evidence, compelled the conclusion that G.C. is likely to be targeted and tortured by his father upon his removal to Mexico.

## COUNSEL

Estelle M. McKee (argued), Supervising Attorney; Alyssa Kastner (argued), Certified Law Student; Cornell Law School, Asylum and Convention Against Torture Appellate Clinic, Ithaca, New York; Luis C. Romero and Amy Rubenstein, Novo Legal Group PLLC, Kent, Washington; for Petitioner.

Aric A. Anderson (argued), Trial Attorney; Kohsei Ugumori and Elizabeth K. Fitzgerald-Sambou, Senior Litigation Counsel; John W. Blakeley, Senior Counsel for Appellate Litigation; Holly M. Smith, Assistant Director; Office of Immigration Litigation; Yaakov M. Roth, Acting Assistant Attorney General; Brian M. Boynton, Principal Deputy Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

Aadhithi Padmanabhan, University of Maryland Francis King Carey School of Law, Federal Appellate Immigration Clinic, Baltimore, Maryland, for Amicus Curiae The Florence Immigrant and Refugee Rights Project.

## ORDER

The majority opinion and partial dissent filed on July 30, 2024, are hereby amended. The amended opinion and amended partial dissent will be filed concurrently with this order.

Judge Nelson and Judge VanDyke voted to deny the petition for panel rehearing and rehearing en banc. Judge Sanchez voted to grant the petition. The full court has been advised of the petition for rehearing en banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 40. The petition for panel rehearing and rehearing en banc (Dkt. No. 64) is thus **DENIED**. No further petitions for rehearing shall be filed.

## OPINION

VANDYKE, Circuit Judge:

Petitioner G.C.[1] petitions for review of a decision of the Board of Immigration Appeals (BIA) affirming the denial of his claims for asylum, withholding of removal, and Convention Against Torture (CAT) deferral. His petition, which details the litany of abuses he suffered during childhood at the hands of his now-deported father, contends that he is entitled to withholding and CAT relief based on a risk of future persecution and torture by his father and the Los Zetas cartel, of which his father is a member.

---

[1] Because the court previously granted (Dkt. No. 27) Petitioner's motion to use a pseudonym (Dkt. No. 26) in any written decision of the court, this opinion refers to him simply as "G.C."

The record does not compel reversal of the agency's denial of G.C.'s claims for withholding and CAT relief. First, the BIA did not abuse its discretion in determining that G.C.'s assault conviction constituted a particularly serious crime, which rendered him ineligible for withholding relief. *See Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1077–78 (9th Cir. 2015). For that reason, we need not consider G.C.'s challenges to the BIA's alternative holding that his withholding claim failed on the merits. And as for his CAT claim, substantial evidence supports the BIA's conclusion that G.C. has failed to show his father would "more likely than not" torture or kill him upon his return to Mexico. *See Rodriguez-Zuniga v. Garland*, 69 F.4th 1012, 1023–24 (9th Cir. 2023). We thus deny G.C.'s petition for review.

## I. Background

### A. Events Leading Up to G.C.'s Removal Proceedings

G.C. is a native and citizen of Mexico. He was born in 1995 and entered the United States without valid entry documents shortly thereafter, sometime in 1996. He has resided in the United States ever since. For much of his childhood G.C. had no lawful status in the United States, but in 2012 he obtained lawful permanent residency after filing a Special Immigrant Juvenile petition.

In February 2018, G.C. was convicted of petty theft under California Penal Code §§ 484(a)–488 and sentenced to 10 days' imprisonment. Later that year, he was charged with felony assault with force likely to produce great bodily injury under California Penal Code § 245(a)(4). He pled guilty and was sentenced to 270 days in county jail and 3 years of probation. In December 2018, the Department of Homeland Security served him with a notice to appear charging him with removability under 8 U.S.C.

§ 1227(a)(2)(A)(ii) as an alien "convicted of two or more crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct."

G.C. initially appeared before an Immigration Judge ("IJ") pro se. But after an inquiry into his competency pursuant to *Franco-Gonzalez v. Holder*, No. CV-10-02211, 2014 WL 5475097 (C.D. Cal. Oct. 29, 2014), the IJ appointed a qualified representative to represent him during the remainder of the removal proceedings. Through his qualified representative, G.C. contested removability. After a contested removal hearing, the IJ sustained the charge based on his underlying theft and assault convictions.

G.C. then applied for asylum, withholding of removal, and CAT relief, arguing that he has a well-founded fear of future persecution and torture upon his return to Mexico arising from several sources, including (1) the police, (2) his now-deported father and the Los Zetas cartel, (3) other cartels, and (4) Mexico's inadequate psychiatric facilities. He also claimed membership in three different proposed classes of particular social groups ("PSGs"): (1) "Sons of [G.C.'s Father]," (2) "Mexican Criminal Deportees with Visible Markers of Gang Membership," and (3) Mexicans with Perceptible Mental Illness."

In support of his application, G.C. offered (1) his own testimony, (2) the testimony of his mother, (3) the testimony of an expert witness, Dr. Robert Kirkland, (4) a psychological evaluation produced by a licensed clinical social worker, Deana Gullo, and (5) various declarations from friends and family members. The IJ found that G.C., his mother, and Dr. Kirkland all testified credibly, and the BIA did not disturb those credibility determinations.

After arriving in the United States, G.C. lived with his mother and sporadically with his father, who was in and out of prison during his childhood. His father physically, emotionally, and sexually abused G.C. and his siblings. He was particularly abusive toward G.C. He made fun of G.C.'s learning and speech disabilities, forced him to use drugs and to steal, molested him, and regularly called him vulgar names—notably for present purposes including the word "bitch."

Though G.C.'s family left Mexico to escape the threat of violence caused by his father's involvement with Los Zetas, his father remained involved with gangs and selling drugs in the United States. When G.C. was 14, his father was deported for drug offenses to Mexico, where he remains a member of the Los Zetas cartel. G.C. has not seen his father since his father's arrest and deportation.

Though his father has not abused him since he was deported, G.C.'s mental health has suffered because of the abuse he suffered in childhood. He has regularly used drugs and has attempted suicide several times. At one point he belonged to a gang. Gullo, the licensed clinical social worker who examined G.C., diagnosed him with Post-Traumatic Stress Disorder (PTSD), Major Depressive Disorder, Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, Specific Learning Disorder, and Opioid Use Disorder. The record elsewhere indicates a prior diagnosis for Bipolar Disorder. He suffers from panic attacks, sees shadows, and experiences auditory hallucinations of his father repeating insults from his childhood. These symptoms persist regardless of whether G.C. takes his prescribed medication. G.C.'s childhood history of abuse has led to anger-management issues, and he

responds poorly to being called names his father once called him, including the "b-word."

The parties dispute the extent to which this evidence of G.C.'s mental health and anger-management issues is relevant to analyzing whether his 2018 assault conviction constitutes a particularly serious crime. G.C., who was homeless at the time of the assault, was drinking and doing drugs with two other men on the roof of a parking garage.[2] One of the men called him a "bitch," and in response, G.C. "snapped," "blacked out," and "started just beating him up." G.C. testified that he punched the man, knocking him over, and continued to kick him after he had fallen to the ground. A police report of the incident corroborates this testimony, noting that G.C. continued to kick or knee the victim in the head from behind after he had fallen over. G.C. was under the influence of drugs at the time of the assault.

## B. G.C.'s Fear of Harm Upon Returning to Mexico

The evidence regarding G.C.'s father's intentions toward him is mixed. G.C. and his family believe that his father resides in the Tijuana area and remains an active member of the Los Zetas cartel. In his declaration, G.C. stated that during his childhood his father repeatedly threatened to kill him, but he has obviously never followed through on such threats. G.C.'s mother and brother testified that his father has made more recent death threats toward G.C. since his deportation. On the other hand, G.C.'s mother testified that on at least one occasion, G.C.'s father expressed a desire to help him, but his mother explained she did not believe his father's offer to help given his continued involvement with the cartel and the prior death threats.

---

[2] His mother had kicked him out of her home due to his drug use.

As further evidence of his father's hostility, G.C. noted that his father recently orchestrated an assault on G.C.'s maternal grandmother, who lives in Mexico. G.C.'s mother, however, attributed the assault to his father's motivation to force her to reunite with him, not to any hostility toward G.C. Overall, the record is not entirely clear regarding who in G.C.'s family his father seeks to harm and what his motives are for doing so.

Should he be deported, G.C. and Dr. Kirkland anticipate that his father will easily be able to determine G.C.'s whereabouts because the United States shares information about criminal deportees with the Mexican government, and Los Zetas is readily able to obtain such information through its government contacts. Cartels like Los Zetas are particularly active around Tijuana and other ports of entry, and Los Zetas has "a strong presence in about 17 Mexican states—or half the country." Moreover, G.C. has visible, gang-related tattoos, and he testified that other cartels will associate him with his father and the Zetas because (1) his last name is uncommon and therefore recognizable and (2) his father is well known.

The evidence regarding resources available to G.C. to mitigate these risks is also mixed. On one hand, Kirkland testified that G.C. may have a difficult time obtaining police protection because of his criminal record and because he will not have lived in Mexico for a long time after his deportation. But on the other hand, Kirkland testified that the Mexican National Guard and federal police have made "significant … improvement" in combatting cartel violence, and that the government is not "inept" in dealing with the problems posed by cartels.

Additionally, there are nonprofit organizations operating on the border that offer recent deportees temporary shelter and protection from the cartels, and the Mexican government has both a national healthcare system and programs in place providing financial assistance and identification documents to help repatriate deportees into Mexican society. Finally, though most of G.C.'s immediate family lives in the United States, he does have "some extended family" in Mexico.

## C.  The IJ's Decision

The IJ denied G.C.'s application. First, the IJ concluded that G.C. was ineligible for asylum and withholding because his conviction for assault with force likely to produce great bodily injury qualifies as a particularly serious crime. *See* 8 U.S.C. § 1158(b)(2)(A)(ii); *id.* § 1231(b)(3)(B)(ii). To support that conclusion, the IJ considered the elements of the offense, the length of the sentence and the maximum sentence that could have been imposed, and the facts and circumstances underlying the conviction, including evidence that G.C. was under the influence at the time of the offense and continued to assault the victim after he had fallen to the ground. The IJ also considered and rejected the possibility that certain mental conditions brought on by his history of abuse mitigated his responsibility for the assault.

The IJ alternatively concluded that G.C. was ineligible for asylum because he had not established past persecution or a well-founded fear of future persecution. The IJ first concluded that G.C. had not alleged any past persecution in Mexico and thus was not entitled to the presumption of future persecution. The IJ then concluded G.C.'s proposed PSGs were not cognizable because they lacked either social distinction, particularity, immutability, or some combination

of the three.[3]  The IJ also rejected G.C.'s claims of a well-
founded fear of future persecution because he failed to
demonstrate that the Mexican government would be
unwilling or unable to protect him or that internal relocation
within Mexico was unreasonable.  And because G.C. was
unable to meet the "lesser" "well-founded fear standard for
asylum," the IJ concluded that G.C. had not met the "more
stringent" "clear probability standard required for
withholding of removal."

Finally, G.C. put forth two "chains of possible events"
underlying his fear of future torture in Mexico, and the IJ
rejected both.  First, the IJ rejected G.C.'s argument that it
was more likely than not his father would torture him
because it concluded that his father's motives were unclear
and that even if his father intended to harm him, there was
insufficient evidence that the Mexican government would be
unwilling or unable to control his father.  Then, it rejected
G.C.'s argument that he would be tortured in a Mexican jail
or mental institution, and G.C. did not press this theory
before the BIA.[4]

**D.  The BIA's Decision**

G.C. appealed the IJ's decision, and the BIA dismissed
his appeal.  It concluded that the IJ's particularly serious

---

[3] Because the BIA did not consider the IJ's analysis of G.C.'s proposed
PSGs to affirm the denial of relief, we also do not assess the proposed
PSGs.  *See Garcia v. Wilkinson*, 988 F.3d 1136, 1142 (9th Cir. 2021)
("In reviewing the BIA's decisions, we consider only the grounds relied
upon by that agency.").

[4] The BIA thus considered this "second possible chain of events" waived,
and because that theory was not exhausted before the agency, G.C.'s
CAT claim before this court is limited to the risk of future torture by his
father.  *See Wilkinson*, 988 F.3d at 1142.

crime determination was not clearly erroneous for two reasons. First, the IJ properly weighed the factors set out in *Matter of Frentescu*, 18 I. & N. Dec. 244 (BIA 1982), and second, the IJ's view of the facts underlying the offense— including its conclusion that G.C.'s mental health did not mitigate his responsibility for the assault—was "based on a plausible and reasonable view of the evidence." The BIA also agreed with the IJ's alternative denial of asylum and withholding, affirming the IJ's conclusions that (1) "the government of Mexico would not be unwilling or unable to protect [G.C.] from his father or the cartel members," and (2) "[G.C.] did not meet his burden of showing that relocation to another part of the country was not reasonable." Finally, the BIA affirmed the denial of CAT relief, finding no clear error in the IJ's factfinding as to G.C.'s father's intent to torture G.C. in the future or the Mexican government's ability and willingness to control him.

G.C. petitioned this court for review.

## II. Jurisdiction and Standards of Review

At the outset, while the parties agree this court has jurisdiction to review G.C.'s petition, they disagree as to the proper basis for that jurisdiction. Their disagreement hinges on the legal basis for G.C.'s removability. G.C. asserts that he was charged with removability as an aggravated felon under 8 U.S.C. § 1227(a)(2)(A)(iii), meaning this court lacks jurisdiction to consider his petition under 8 U.S.C. § 1252(a)(2)(C). G.C. thus resorts to the saving clause in 8 U.S.C. § 1252(a)(2)(D) to preserve jurisdiction over the issues raised in his petition.

For its part, the government contends that G.C. was removable under 8 U.S.C. § 1227(a)(2)(A)(ii). This court lacks jurisdiction to review petitions brought by aliens

removable under § 1227(a)(2)(A)(ii) only when both crimes
are punishable by a sentence of one year or longer. 8 U.S.C.
§ 1252(a)(2)(C); *id.* § 1227(a)(2)(A)(i)(II). Because G.C.'s
petty theft conviction was punishable by a maximum of six
months imprisonment, *see* Cal. Penal Code § 490, the
government argues that review is not precluded by
§ 1252(a)(2)(C).

The government is correct. Contrary to G.C.'s argument
that he was deemed removable because of an aggravated
felony, the record indicates that he was both charged with
removability and found removable for two crimes involving
moral turpitude under 8 U.S.C. § 1227(a)(2)(A)(ii). Thus, 8
U.S.C. § 1252(a)(2)(C) does not pose a barrier to reviewing
G.C.'s petition, the court has jurisdiction under § 1252(a)(1),
and there is no need to resort to the saving clause in
§ 1252(a)(2)(D) as G.C. suggests.

Our jurisdiction established, G.C. next argues that the
BIA erred in denying his application for three reasons. First,
he argues the agency erred in conducting its particularly
serious crime analysis by failing to consider all the evidence
of G.C.'s mental health and by applying an overly restrictive
legal standard to that portion of the mental health evidence it
did consider. Second, he contends the BIA wrongly rejected
his withholding claim on an alternative basis because it failed
to consider whether the government of Mexico can control
G.C.'s father and Los Zetas, ignored evidence that it is
unwilling to do so, and failed to apply the mandatory
regulatory factors in 8 C.F.R. § 1208.16(b)(3) when
determining whether relocation was reasonable. Finally, he
argues the agency wrongly denied CAT relief because it
ignored evidence demonstrating it is more likely than not that

he will be tortured with the acquiescence of the Mexican government.[5]

While a claim that the BIA applied the wrong legal standard in determining whether a conviction constitutes a particularly serious crime raises a question of law, *see Gomez-Sanchez v. Sessions*, 892 F.3d 985, 990 (9th Cir. 2018), this court reviews the BIA's determination that a crime is particularly serious for abuse of discretion. *Arbid v. Holder*, 700 F.3d 379, 383 (9th Cir. 2012). The court reviews the agency's fact-finding "under the highly deferential substantial evidence standard," which treats an agency's findings of fact as conclusive unless "any reasonable adjudicator would be *compelled* to conclude to the contrary." *Rodriguez-Zuniga*, 69 F.4th at 1016 (citation omitted). Applying these standards, we conclude that none of G.C.'s arguments merit granting his petition.

### III. The Agency's Particularly Serious Crime Determination

We first conclude that the BIA neither applied the wrong legal standard nor abused its discretion in concluding that G.C.'s assault conviction was a particularly serious crime. Aliens "convicted of particularly serious crimes … are barred from obtaining withholding of removal." *Gomez-Sanchez*, 892 F.3d at 990; *see also* 8 U.S.C. § 1231(b)(3)(B)(ii). While an aggravated felony punishable by five or more years imprisonment is categorically a particularly serious crime, the BIA may also conclude on a case-by-case basis that a crime punishable by less than five

---

[5] Because G.C. has not challenged the BIA's decision to uphold the IJ's denial of asylum relief before this court, that claim is waived. *See Antonio v. Garland*, 58 F.4th 1067, 1072 n.7 (9th Cir. 2023).

years imprisonment is particularly serious. *Id.* § 1231(b)(3)(B); *see also Blandino-Medina v. Holder*, 712 F.3d 1338, 1344 (9th Cir. 2013) ("[T]he record in most proceedings will have to be analyzed on a case-by-case basis." (quoting *Matter of Frentescu*, 18 I. & N. Dec. at 247)).

"The applicable legal standard to determine if a crime is particularly serious, described in the BIA's decision in *Matter of Frentescu*, … requires the agency to ask whether 'the nature of the conviction, the underlying facts and circumstances[,] and the sentence imposed justify the presumption that the convicted immigrant is a danger to the community.'" *Avendano-Hernandez*, 800 F.3d at 1077 (quoting *Delgado v. Holder*, 648 F.3d 1095, 1107 (9th Cir. 2011) (en banc)). When reviewing for abuse of discretion, the court "is limited to ensuring that the agency relied on the appropriate factors and proper evidence to reach [its] conclusion." *Id.* (cleaned up). Among the underlying facts and circumstances relevant to the conviction is "the defendant's mental condition at the time of the crime." *Gomez-Sanchez*, 892 F.3d at 996.

Here, both the IJ and the BIA explicitly considered the factors laid out in *Frentescu*.[6] The IJ considered the nature of the conviction by examining the elements of the crime, noting that it required both the willful use of force against another and a degree of force likely to cause great bodily

---

[6] "Where, as here, the BIA agrees with the IJ's reasoning, we review both decisions." *Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1293 (9th Cir. 2018).

injury.[7]  Regarding G.C.'s sentence, the IJ concluded that "270 days in county jail and three years of probation is [] a weighty sentence" and noted that the statute authorized even harsher penalties of several years' imprisonment.  Finally, the IJ considered the underlying facts and circumstances, noting that G.C. continued to attack the victim even after he had fallen to the ground and was under the influence of drugs and alcohol at the time of the offense.  The BIA found no clear error in the IJ's factfinding as to any of the *Frentescu* factors and incorporated the IJ's particularly serious crime analysis into its decision.

Additionally, both the IJ and the BIA relied on appropriate evidence in conducting their analyses, including evidence of G.C.'s mental illnesses.  The record reflects that the IJ and the BIA considered evidence that G.C. was suffering from PTSD at the time of the assault and the absence of any evidence that G.C. was experiencing hallucinations that might have motivated his actions.  G.C. now objects to the fact that the agency did not consider such evidence sufficient to mitigate the violent nature of the underlying offense, but this court "may not reweigh the evidence and reach [its] own determination about the crime's seriousness."  *Avendano-Hernandez*, 800 F.3d at 1077.

G.C. faults the IJ and the BIA for considering only his PTSD diagnosis and not his accompanying diagnoses for Major Depressive Disorder, Unspecified Schizophrenia Spectrum and Other Psychotic Disorder, and Bipolar

---

[7] Although the IJ incorrectly asserted that the elements of the crime alone were sufficient to establish that G.C.'s offense was particularly serious, *contra Blandino-Medina*, 712 F.3d at 1348, the BIA did not make the same mistake, and the IJ nevertheless proceeded to analyze the other *Frentescu* factors.

Disorder.  But that argument is unconvincing because it fails to accurately characterize the agency's reasoning and would require us to impose a non-existent legal requirement that the agency must expressly consider every diagnosed mental disorder no matter whether the applicant attributes his offense to the diagnosis.

Even though the agency's decisions expressly name only G.C.'s PTSD diagnosis, the record does not support the conclusion that the agency considered only that condition. As G.C. himself acknowledges, both the IJ and the BIA considered the absence of any hallucinations as a relevant factor.  Gullo's report attributes G.C.'s hallucinations not to his PTSD, but to his Unspecific Schizophrenia Spectrum and Other Psychotic Disorder, and nowhere in her three-page description of G.C.'s PTSD diagnosis did Gullo reference G.C.'s hallucinations.  Nor is there any indication, as G.C. suggests, that the IJ and the BIA wrongly attributed the hallucinations to the PTSD diagnosis.  In short, there is no reason to assume the agency arbitrarily limited its analysis of G.C.'s mental health problems to PTSD.

Moreover, evidence of mental illness is only relevant to the *Frentescu* analysis insofar as an applicant attributes the offense to the illness.  As this court has recently explained, "*Gomez-Sanchez* did not impose a new standard that the IJ must always reference a petitioner's mental health in a 'particularly serious crime' determination.  Rather, … the consideration of mental illness anticipated by *Gomez-Sanchez* is required only where the petitioner … presents … evidence directly attributing the crime to his mental illness." *Benedicto v. Garland*, 12 F.4th 1049, 1062 (9th Cir. 2021) (cleaned up).

Here, G.C. attributed the attack directly to the victim calling him a "bitch," which has "special significance" to him because "[t]hat's the wor[d] that [his] dad used to use a lot towards [him]" and which he testified caused him to "snap,[]" "black[] out," and attack the victim. The IJ's decision demonstrates that it clearly understood the relevance of the victim's verbal provocation given G.C.'s history of abuse, as it explicitly made the connection between the use of the word "bitch" and the "abuse [G.C.] suffered as a child." The agency then reasonably concluded that while G.C. "snapped" and "blacked out," there was no evidence that reaction was caused by the auditory hallucinations he sometimes suffered because of his past abuse.

The agency thus considered G.C.'s mental illness diagnoses insofar as G.C. suggested that such illnesses motivated the assault, as *Benedicto* requires. It acknowledged the potential that the illnesses might have contributed to G.C.'s behavior, but stopped short of concluding he was hallucinating, a factor which might have mitigated the inference of dangerousness that could be drawn from G.C.'s behavior. To the extent G.C. separately relies on Gullo's report, which lists his many diagnoses, to argue that the agency must specifically mention each of his diagnoses by name and then conduct a diagnosis-by-diagnosis analysis of each one, we rejected such a proposal in *Benedicto*, and we again refuse to impose any such requirement on the agency here. *See Benedicto*, 12 F.4th at 1062.

Finally, notwithstanding G.C.'s assertions to the contrary, neither the IJ nor the BIA invented "a non-existent legal requirement that the [alien] experience hallucinations during the crime" for his mental health conditions to

sufficiently mitigate the seriousness of a criminal conviction. As this court noted in *Gomez-Sanchez*, the "essential key" to the particularly serious crime inquiry is dangerousness. 892 F.3d at 991 (citation omitted). As such, the IJ as factfinder should "examine what he or she deems reliable evidence of mental health and decide whether such evidence bears on the dangerousness determination." *Id.* at 994.

Against this legal backdrop, it is clear enough that the IJ mentioned the absence of "any visual or auditory hallucinations at the time of [the] offense" *not* for the purpose of suggesting that such hallucinations are categorically required for a mentally ill applicant to rebut a particularly serious crime determination. Instead, the IJ examined the "reliable evidence of mental health" available in the record, *id.*, and presumably concluded that, had there been evidence G.C. was suffering from hallucinations, such evidence might have been one reason to mitigate the otherwise-violent nature of the offense. Mentioning the absence of such evidence, then, does not imply that it is always required—it merely acknowledges that no such mitigating factor existed on this record.

Indeed, G.C.'s hair-trigger reaction to being called a "bitch" only magnifies the danger he poses, given that he is willing to commit assault likely to produce great bodily injury over a relatively minor provocation. While the litany of evidence detailing G.C.'s history of mistreatment and his various diagnoses might make his behavior more understandable in some sense or perhaps even less culpable in a criminal case, "[t]he IJ is not retrying the question of guilt." *Id.* Instead, the IJ is concerned with determining how the crime informs the issue of the applicant's dangerousness. Here the agency plausibly concluded that G.C.'s mental

illnesses do not render the assault a less reliable indicator of G.C.'s dangerousness.

For these reasons, the BIA did not abuse its discretion in concluding that G.C.'s assault conviction was a particularly serious crime, and it did not commit legal error by expressly mentioning only the most salient aspects of G.C.'s various diagnoses of mental illness and concluding those facts did not mitigate the underlying dangerousness of the offense he committed. Because the agency's particularly serious crime determination means G.C. is "barred from obtaining withholding of removal," *id.* at 990, we proceed no further in considering G.C.'s challenges to the agency's rejection of his withholding claim.

## IV. The Agency's Denial of CAT Relief

That leaves the BIA's decision affirming the denial of G.C.'s claim for CAT deferral. As an applicant for CAT relief, G.C. "must prove [1] that it is more likely than not that he … would be tortured if removed to the proposed country" and "[2] that torture must be inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Rodriguez-Zuniga*, 69 F.4th at 1023 (cleaned up). G.C. must meet his burden at both the likelihood-of-future-torture prong and the acquiescence prong to demonstrate his entitlement to relief. Failure at either step is fatal to his CAT claim.

G.C. assigns two errors to the agency's CAT analysis, first criticizing its decision to ignore G.C.'s childhood history of abuse because it occurred in the United States, not Mexico, and then arguing the agency's factfinding regarding the likelihood of future torture and acquiescence of the

Mexican government were unsupported by substantial evidence. Neither of these arguments is convincing.

## A. The BIA did not err by discounting evidence of G.C.'s history of abuse at the hands of his father during his childhood in the United States.

G.C. first contends the agency erred by wrongly discounting evidence of alleged "past torture" at the hands of his father because such abuse occurred in the United States, not Mexico. In G.C.'s view, "past torture" must include abuse outside the proposed country of removal because unlike 8 C.F.R. § 1208.16(b)(1)(i), which applies to claims for withholding relief and requires evidence of "past persecution *in the proposed country of removal*" (emphasis added), the text of 8 C.F.R. § 1208.16(c)(3)(i) imposes "no geographic limitation on past torture" for CAT claims.

In response, the government acknowledges the textual difference between the two regulations but emphasizes that the regulatory definition of "torture" requires that the torture must occur with the acquiescence of the government to be actionable under CAT. Because that is so, the government argues, past injury that would otherwise rise to the level of torture in the United States does not fit the regulatory definition of "torture" because such injury did not occur with the acquiescence of the Mexican government. Consistent with this view of the relevant regulatory definitions, the government contends that, practically speaking, "past harm in the United States says nothing about the likelihood that the Mexican government will acquiesce to severe harm in Mexico."

We agree with the government's interpretation of the CAT regulations. Under 8 C.F.R. § 1208.18(a)(1), "[t]orture is defined as any act by which severe pain or

suffering … is intentionally inflicted on a person … when such pain or suffering is inflicted by, or at the instigation of, or with the consent or acquiescence of, a public official acting in an official capacity or other person acting in an official capacity."  Because the regulatory definition of "torture" itself explains that abuse must be sanctioned or acquiesced to by an official of the country of removal to be actionable under CAT, the textual distinction suggested by G.C. between the withholding and CAT regulations is ultimately a distinction without a meaningful difference in this case.  Nothing in the record suggests that the abuse by G.C.'s father was inflicted by, instigated by, or occurred with the acquiescence of a Mexican public official, so the past mistreatment does not constitute "past torture."

Moreover, the government's observation about the relationship between the torture and the location in which the torture occurs is also intuitively sensible and accords with this court's announced purposes for considering evidence of past torture.  *See Nuru v. Gonzales*, 404 F.3d 1207, 1217 (9th Cir. 2005) ("Past torture is the first factor we consider in evaluating the likelihood of future torture because past conduct frequently tells us much about how an individual or a government will behave in the future.").  While G.C.'s testimony about his father's history of abuse might be some evidence of his father's intent to cause G.C. harm in the future, it says nothing at all about the Mexican government's willingness to acquiesce in such torture.  And as the regulatory definition of "torture" makes clear, infliction,

instigation, or acquiescence is an element that is required for abuse or harm to qualify as past "torture" under CAT.[8]

G.C. contends that this court has already conclusively resolved this question in his favor in *Xochihua-Jaimes v. Barr*, 962 F.3d 1175 (9th Cir. 2020). But we are unconvinced. Unlike G.C., who was abused entirely in the United States, the past torture underlying the petitioner's CAT claim in *Xochihua-Jaimes* occurred in both Mexico and

---

[8] Importantly, we do not understand our dissenting colleague to disagree with this understanding of what 8 C.F.R. § 1208.18(a)(1) requires for harm to rise to the level of "torture" for purposes of determining CAT eligibility. The dissent does, however, argue that "significant past *harm* is relevant to the likelihood of future torture when the perpetrator of that harm is in the country of removal," and thus the evidence of past harm is "highly probative" and "cannot be so easily dismissed."

It's worth making two points about such reasoning. First, even if it is true that the evidence of past harm is relevant—an issue which, as explained below, we need not resolve here—it does *not* prove the agency erred in concluding *as a legal matter* that G.C.'s father's pattern of harming him did not qualify as "past torture" and thus did not qualify for the kind of privileged consideration it so often receives under this court's CAT precedents. *See Nuru*, 404 F.3d at 1218 ("[P]ast torture is ordinarily the principal factor on which we rely when an applicant who has previously been tortured seeks relief under [CAT].").

And second, to the extent the dissent means to suggest that in this case the agency altogether ignored the evidence of past harm—setting aside whether such harm qualifies as "torture"—such a suggestion misreads the IJ's and the BIA's decisions. The IJ recounted G.C.'s father's sordid history of abuse in detail, and later specifically noted the father's past death threats—many of which occurred during and formed a part of the childhood history of abuse—as part of its fear-of-future-torture analysis. Thus, just as the dissent correctly concludes "it is clear that the BIA was aware of and considered evidence that G.C. suffered from several mental health conditions," there is likewise no reason to believe the agency altogether failed to consider G.C.'s father's past harmful behavior toward him.

the United States. *Id.* at 1178–79. Thus, when we held "it [wa]s likely she [would] be tortured again if *returned* to the site of *her prior suffering*," we obviously meant Mexico, where some of the torture had already occurred. *Id.* at 1188 (emphasis added) (cleaned up). Because *Xochihua-Jaimes* did not involve a petitioner whose abuse had occurred exclusively outside of the country of removal, it does not resolve the issue in G.C.'s favor.[9]

## B. Substantial evidence supports the agency's fact-finding regarding the likelihood of future torture.

Finally, G.C. argues that the agency erred by discounting evidence demonstrating that (1) G.C.'s father had a continuing interest in him and (2) public officials in Mexico will acquiesce in his torture.[10] Ultimately, these arguments fail because substantial evidence supports the IJ's conclusion that there is not a greater than fifty percent

---

[9] The dissent notes that the *Xochihua-Jaimes* court considered evidence of past harm in Arizona and North Carolina as part of its fear-of-future-harm analysis. That is true, but again, *Xochihua-Jaimes* was different because there, the abuse that occurred in the United States was part of a cross-border course of abuse that occurred in both Mexico and the United States. And as already explained, there is no reason to believe here that the BIA *altogether* disregarded G.C.'s father's harmful behavior in the United States. Instead, it simply (and correctly) concluded that such behavior did not rise to the regulatory definition of past torture.

[10] G.C. also challenges the BIA's failure to consider the evidence G.C. presented suggesting that he would be targeted by Mexican law enforcement on account of his tattoos and history of gang membership. But as noted above, G.C. waived that by failing to argue it before the BIA. Therefore, we consider only the exhausted aspect of G.C.'s CAT claim, which is premised on the possibility of future torture perpetrated by his father, not by government actors.

likelihood that G.C.'s father would kill or otherwise torture him if he were removed to Mexico.

The IJ and the BIA relied on three facts in the record, namely (1) the passage of time, (2) past unfulfilled death threats, and (3) the lack of clarity regarding G.C.'s father's motives, concluding those facts "cast doubt upon the likelihood that he would actually follow through with killing or torturing [G.C.] now." The BIA affirmed this finding, and in our view, "[t]he record compels no different conclusion." *Rodriguez-Zuniga*, 69 F.4th at 1022.

In his opening brief, G.C. criticizes the IJ's reliance on the fact that past death threats went unfulfilled, arguing that G.C.'s father "was physically incapable of acting on his threats" "for the past fifteen years" because "he was either in prison or deported to Mexico" during that time. G.C. provides no evidence for the argument that his father was *never* capable of following through on his death threats at any time after making them, and given that G.C.'s father threatened to kill him early in his childhood, it seems highly improbable that his father had absolutely no opportunity to act upon his threats—especially given the litany of other abuses that G.C. testified his father *was* able to perpetrate.

Next, G.C. argues that the IJ's reliance on his father's statement that he "wanted to help" him was misplaced because his mother expressed that she did not believe G.C.'s father's offer of assistance was genuine. But even though the agency deemed his mother's testimony credible, her speculation as to his father's motives is exactly that—speculation—and while that speculation might reduce the probative value of G.C.'s father's statement, it does not entirely negate the extent to which his father's seeming change in posture might inform his present motives. Put

another way, a reasonable adjudicator could continue to put some evidentiary weight on G.C.'s father's offer of assistance notwithstanding his mother's speculation as to its authenticity and the other evidence in the record that weighs against crediting the father's statement.[11]

Taken together, these facts cast sufficient doubt on G.C.'s father's present motives toward G.C. for us to conclude that the record does not compel a conclusion contrary to the BIA's that it is not more likely than not that G.C.'s father will seek to torture him upon his return to Mexico.

In resisting that conclusion, the dissent relies at length on other facts in the record, including (1) G.C.'s childhood history of abuse, (2) his father's continued involvement with gangs, and (3) most importantly, a litany of dire predictions from G.C.'s mother, brother, and former girlfriend about the potential violence G.C. may face at his father's hand. But while such evidence could support the conclusion that it is more likely than not that G.C.'s father would torture him upon his return to Mexico, that is not the conclusion the BIA reached, and the dissent's privileging of such evidence reveals the extent to which it misunderstands our task when reviewing the agency's decision for substantial evidence.

Our job "[u]nder that extremely deferential standard of review" is not to "independently weigh the evidence and reverse the agency" whenever we feel a different result is more in line with the greater weight of the evidence. *Kalulu v. Garland*, 94 F.4th 1095, 1099 (9th Cir. 2024); *see also*

---

[11] The dissent is thus clearly incorrect in insisting that "there is *no* reliable evidence in the record contradicting the testimony that G.C.'s father wants to kill G.C. and has *recently* threatened and targeted his family."

*Don v. Gonzales*, 476 F.3d 738, 743 (9th Cir. 2007) ("The approach taken in the dissenting opinion amounts to an impermissible re-weighing of the evidence.").

Our approach in *Kalulu* is instructive. There, the agency "based its adverse credibility determination on … twelve inconsistency and implausibility findings and … [petitioner's] demeanor during her hearing." *Id.* at 1110.[12]   Notwithstanding the fact that there was some indication that at least some of the twelve inconsistency findings were not reliable, our court rejected the petitioner's and a dissenter's suggestions that "those inconsistencies and her demeanor" should be "counterbalanced by other consistencies in her testimony." *Id.* at 1104. Instead, we concluded that "at least four independent and supported factual findings … together constitute[d] more than substantial evidence supporting the agency's credibility determination," notwithstanding other, credible testimony that might have supported the agency reaching some other conclusion. *Id.* at 1109. Like in *Kalulu*, where the mere presence of some credible testimony did not undermine the substantial evidence supporting an adverse credibility finding, here the presence of some evidence suggesting that G.C.'s father may intend to torture him upon his return to Mexico does not undermine the substantial evidence supporting the agency's contrary conclusion.

---

[12] While this case does not involve an adverse credibility determination, it does involve other disputed factfinding, and this court reviews adverse credibility determinations like any other factual finding. *Chebchoub v. INS*, 257 F.3d 1038, 1042 (9th Cir. 2001) ("[W]e review the [BIA]'s factual determinations—including its credibility findings … for substantial evidence.), *superseded on other grounds by statute as stated in Shrestha v. Holder*, 590 F.3d 1034, 1046 (9th Cir. 2010).

The dissent magnifies its misapplication of substantial evidence review by engaging in the kind of reasoning that once motivated this court to craft another of its misbegotten and now-thoroughly rejected immigration rules: the "deemed-true-or-credible rule." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021). Under that rule, this court concluded it "must assume that the alien's factual contentions are true" "in the absence of an explicit adverse credibility finding by the agency." *Id.* at 364 (alterations omitted) (quoting *Kataria v. INS*, 232 F.3d 1107, 1114 (2000)). The dissent's reasoning here, which (1) repeatedly relies on the agency's conclusion that G.C.'s mother, brother, and expert witness testified credibly and (2) wholly credits even the most speculative aspects of their testimony, bears the indelible mark of the now-defunct "deemed-true-or-credible rule." Essentially, the dissent reasons that because (1) the witnesses testified credibly and (2) some aspects of their testimony, if credited, would support G.C.'s claim for CAT relief, the agency erred by failing to reach a conclusion consistent with the testimony of such witnesses.

Take, for example, the dissent's treatment of G.C.'s brother's testimony that he "wouldn't last a week" in Mexico or his mother's testimony that she "d[id]n't believe [his father]" when "he said he wanted to help [G.C.]" "because he told [her] on several occasions[] that he was going to kill [G.C. and his siblings]." Regarding each of these statements, the dissent's approach would essentially force the BIA to deem true the matter asserted—the speculation as to how long G.C. would last after returning to Mexico or as to his father's motives—from the simple fact that the IJ considered their testimony credible. But as the Supreme Court explained in *Ming Dai*, that logical leap is unwarranted. "It's not always the case that credibility equals

factual accuracy, nor does it guarantee a legal victory." *Ming Dai*, 593 U.S. at 372.

The dissent attempts to distinguish its suggested approach from the deemed-true-or-credible rule by noting that here, the IJ expressly found that G.C. and his supporting witnesses had testified credibility.  But the dissent's approach is nonetheless premised on the same wrong logic that animated our former rule.  Like the deemed-true-or-credible rule, the dissent wrongly conflates the testimony's *credibility* with its *persuasiveness* and advocates for a standard more akin to the one we employ when reviewing the allegations in a complaint on appeal that was dismissed at the motion to dismiss stage.  Such a standard "has no proper place" here, where our review is supposed to be exceedingly deferential *towards the agency*, not the petitioner and his witnesses.  *Ming Dai*, 593 U.S. at 365.

Nor do other, related provisions of the INA offer any support for the dissent's approach.  As the statute elsewhere describes an asylum petitioner's evidentiary burden, "[t]he testimony of the applicant *may* be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is *persuasive*, and refers to facts sufficient to demonstrate that the applicant is a refugee."  8 U.S.C.  § 1158(b)(1)(B)(ii)  (emphases  added).   This provision  distinguishes  between  credibility  and persuasiveness and sends a clear message that credible testimony may, but oftentimes *may not*, satisfy a petitioner's burden of proof.  To put it another way, under the INA, credible testimony does not suffice unless the IJ *also* finds the testimony persuasive.  *See id.*

It should thus come as no surprise that the Supreme Court considered and rejected the exact kind of reasoning the dissent now engages in by unanimously rejecting our erroneous "deemed-true-or-credible" rule in *Ming Dai*. Such a rule dramatically narrows the agency's supposedly wide factfinding discretion and presents it with a sort of Hobson's choice: either find the petitioner explicitly noncredible and *reject* 100% of his testimony, or our court would assume the agency *accepted* 100% of the petitioner's testimony as 100% true and persuasive. But *Ming Dai* rejected this false dichotomy and made clear when "[f]aced with conflicting evidence, it seems likely that a reasonable adjudicator could find the unfavorable account more persuasive than the favorable version," and as here, rule against the petitioner accordingly. *Id.*

Try as it might to avoid the comparison, the dissent's approach to the evidence in this record (both speculative and otherwise) is ultimately objectionable for the same reason that our old "deemed-true-or-credible rule" was: "Rather than ask whether the agency's finding qualifies as one of potentially many reasonable possibilities, it gives conclusive weight to any piece of testimony that cuts against the agency's finding." *Id.* at 368. Such an approach is error because it "mistakenly flips th[e] [extremely deferential substantial evidence] standard on its head." *Id.* Instead of, as the dissent does here, searching the record for other evidence that could reasonably support a conclusion other than the one the agency reached, the "only question for judges reviewing the BIA's factual determinations is whether *any* reasonable adjudicator could have found *as the agency did*." *Id.* (first emphasis in original, second emphasis added).

* * *

The dissent is correct that there is evidence in the record that could have supported the conclusion that G.C.'s father still meant to harm him, had the agency made such a finding. Both the dissent and G.C. seize on such evidence at length, and each spills much ink recounting all the record evidence that favors G.C. Such arguments do not guarantee G.C. victory, however, as they serve only to demonstrate how the agency *could* have potentially marshalled the evidence differently to afford CAT relief to G.C. But that is not the conclusion reached by the BIA, and as explained above, the record does not *compel* a conclusion contrary to the one the agency actually reached. *See Rodriguez-Zuniga*, 69 F.4th at 1016. The agency's conclusion that there is not a greater-than-50% likelihood that G.C.'s father will torture him upon his return to Mexico is supported by substantial evidence, and G.C.'s CAT claim thus fails under our well-established standard of review applied properly.[13]

## V. Conclusion

While G.C. regrettably suffered serious abuses at his father's hand during his childhood, the agency did not err by denying his claims for withholding and CAT relief. It did not abuse its discretion by concluding that G.C.'s mental

---

[13] Because substantial evidence supports the agency's conclusion regarding the likelihood of future torture, we need not (1) address whether substantial evidence also supports its conclusion that the Mexican government would not acquiesce in such torture or (2) respond to the dissent's lengthy recounting of evidence suggesting the BIA *could have*—but as discussed above, was not necessarily *compelled to*—reached the opposite conclusion. Because failure at either step is fatal to G.C.'s CAT claim, we need not proceed any further than G.C.'s failure at the likelihood-of-future-torture prong of the analysis.

illnesses and history of abuse did not mitigate his assault conviction, nor did it devise and apply a new, overly restrictive legal standard to the evidence of G.C.'s mental illnesses. Moreover, because the definition of "torture" in the CAT regulations expressly encompasses consent or acquiescence by the government of the country of removal, the agency did not err by excluding the past abuses G.C. suffered in the United States from an analysis of past torture. Finally, because a reasonable adjudicator could have concluded based on (1) the passage of time, (2) the past unfulfilled death threats, and (3) the conflicting evidence of motive that G.C.'s father's disposition toward him had changed, we conclude that a "reasonable adjudicator would [not] be *compelled* to" reach a conclusion "to the contrary" of that reached by the agency in this case. *Rodriguez-Zuniga*, 69 F.4th at 1016. We therefore deny G.C.'s petition for review of his withholding and CAT claims.

**PETITION DENIED.**

---

SANCHEZ, Circuit Judge, concurring in part and dissenting in part:

I concur with the majority that the Board of Immigration Appeals ("BIA" or the "agency") did not abuse its discretion in concluding that G.C.'s assault conviction was a particularly serious crime. Reading the record as a whole, it is clear that the BIA was aware of and considered evidence that G.C. suffered from several mental health conditions at the time of the assault, but the agency concluded that the evidence did not sufficiently mitigate its dangerousness determination. *See Gomez-Sanchez v. Sessions*, 892 F.3d 985, 991 (9th Cir. 2018) (holding that "danger to the

community" is the "essential key" to a particularly serious crime determination (citation omitted)). G.C. is therefore statutorily barred from withholding of removal. *See* 8 U.S.C. § 1231(b)(3)(B)(ii).

I write separately because I would find that G.C. is entitled to protection under the Convention Against Torture ("CAT"). Contrary to the majority's portrayal of the record, the evidence is not "mixed" concerning the likelihood that G.C. will be tortured if removed to Mexico. G.C.'s father is a member of the notorious Los Zetas cartel—one of the largest criminal syndicates in Mexico—and a violent drug dealer who beat, burned, sexually assaulted, and threatened G.C. with death throughout G.C.'s childhood. Testimony from G.C.'s brother and mother, found credible by the Immigration Judge ("IJ"), details several recent death threats and acts of violence by G.C.'s father directed at G.C. and his family. G.C also provided extensive country conditions evidence and uncontroverted expert testimony establishing that Mexican officials acquiesce to acts of violence by Los Zetas cartel. The uncontroverted evidence of a particularized risk of harm and extensive country conditions and expert evidence compels the conclusion that G.C. is likely to be targeted and tortured by his father upon his removal to Mexico. We have granted several petitions for CAT relief in situations like these involving targeted violence by the Zetas cartel in Mexico. We should do the same here. I respectfully dissent from the Court's denial of CAT relief.

## I.

A person ineligible for withholding of removal remains statutorily eligible to seek deferral of removal under Article III of CAT. 8 C.F.R. § 1208.17(a). G.C. must prove that

upon his return to Mexico he "is more likely than not to be tortured," *id.*, either "by, or at the instigation of, or with the consent or acquiescence of a public official . . . or other person acting in an official capacity," *id.* § 1208.18(a)(1); *see also Avendano-Hernandez v. Lynch*, 800 F.3d 1072, 1079 (9th Cir. 2015).

G.C. was born in Mexico in 1995 and came to the United States at the age of one. In and out of prison during G.C.'s childhood, G.C.'s father physically, emotionally, and sexually abused G.C. and his siblings. G.C.'s father was particularly abusive toward G.C. For more than a decade, G.C.'s father burned him with cigarettes, beat him with cables, groped his genitals, mocked his learning and speech disabilities, forced him to use drugs and to steal, threatened to kill him, and regularly showered him with insults, including calling him "faggot" and "bitch." The abuse ended only when G.C. turned twelve and his father was arrested on drug-trafficking offenses and later deported to Mexico.

The majority concludes that evidence such as "G.C.'s testimony about his father's history of abuse" in the United States "says nothing at all about his willingness to do so *in Mexico*," reasoning that the harm does not qualify as "past torture" under the CAT regulations. But this evidence cannot be so easily dismissed. Even if the term "torture," as defined in 8 C.F.R. § 1208.18(a)(1), contemplates that an act must occur "with the consent or acquiescence of" a person acting in an official capacity in the country of removal, significant past *harm* is relevant to the likelihood of future torture when the perpetrator of that harm is in the country of removal. The CAT regulations provide that we must consider "*all evidence* relevant to the possibility of future torture . . . , including, but *not limited* to" evidence of "past torture." *See id.* § 1208.16(c)(3) (emphases added).

Evidence of significant prior harm at the hands of a person now in the country of removal informs the ultimate inquiry "whether it is more likely than not that an applicant would be tortured in the proposed country of removal." *Id*.[1]

We addressed a similar situation in *Xochihua-Jaimes v. Barr*, 962 F.3d 1175 (9th Cir. 2020), where we granted petitioner's request for CAT deferral because the petitioner would be removed to Mexico where her past abusers and their relatives were living. *Id*. at 1188. The petitioner had an abusive relationship with a man connected to Los Zetas, and his nephew had attempted to sexually assault her in North Carolina. *Id*. at 1179. The Department of Homeland Security later deported the nephew to Mexico, and the petitioner sought CAT deferral based on her belief that her ex-partner's "Zetas relatives in Mexico would torture and murder" her and her child if removed to Mexico. *Id*. at 1180. In assessing the likelihood of future torture, we evaluated evidence of the rapes, beating, and death threat the petitioner had experienced in Mexico. *Id*. at 1188. But we also considered evidence of harm that occurred in the United States, such as death threats the petitioner received from her ex-partner's Zeta relatives in Arizona and the attempted sexual assault in North Carolina. *See id*. Similarly here, the almost-daily beatings, sexual assaults, and frequent death threats G.C. experienced from his father for more than a decade of his childhood demonstrate a likelihood that G.C.

---

[1] Rather than engage with the proper standard under CAT for evaluating evidence of future torture, *see* 8 C.F.R. § 1208.16, the majority cites 8 U.S.C. § 1158, a provision that concerns whether "the applicant is a refugee" in the asylum claim. Our review under the applicable CAT regulations requires us to consider G.C.'s evidence of the substantial likelihood of future torture and compels a result contrary to the one reached by the BIA and the majority.

will be targeted for future violence in Mexico where his father resides. *See id.* And as discussed below, the likelihood that G.C will be murdered or tortured in Mexico is greatly magnified by his father's membership in Los Zetas, a criminal organization with vast reach and influence throughout Mexico. Like the BIA below, the majority errs by excluding this highly probative evidence of past harm.

In addition, the agency's factual findings concerning the likelihood of future torture lack any evidentiary basis in the record. As the majority notes, the agency concluded that (1) the passage of time, (2) past unfulfilled death threats, and (3) the lack of clarity regarding G.C.'s father's motives "cast doubt upon the likelihood that he would actually follow through with killing or torturing [G.C.] now."

The evidence compels a contrary conclusion. G.C.'s father remains a member of Los Zetas cartel in Mexico and continues to make death threats against G.C. to this day, negating that the "passage of time" has had any material effect on the intent of G.C.'s father to kill G.C. G.C.'s brother submitted a declaration stating that in 2019, during the pendency of G.C.'s immigration proceedings, he spoke to their father who "said that he would kill [G.C.] if he is deported to Mexico." His brother added that he knows if G.C. is deported, "he wouldn't last a week." G.C.'s mother testified that when G.C.'s father spoke to their eldest son, "Supposedly, he said he wanted to help [G.C.]," but she "d[id]n't believe him" "because he told [her] on several occasions, that he was going to kill [G.C. and his siblings]." G.C.'s former girlfriend also submitted a declaration that G.C.'s father "has threatened to kill [G.C.] or any of his siblings if they get deported." She wrote that if G.C. "or any of his other siblings fall onto the other side of the border, they will get a bullet in their head."

Like the agency, the majority erroneously relies on the fact that G.C. remains alive to discount his father's "past unfulfilled death threats." Death, however, is not a requirement for obtaining CAT relief. We would never review a CAT claim where a petitioner has shown "fulfilled death threats" because the petitioner would already be dead. G.C.'s father was physically incapable of acting on his threats for the past fifteen years because he was either imprisoned or deported to Mexico. The majority counters that, when G.C. was a child, his father surely had the capability and opportunity to kill him but did not do so. But the extreme pain and suffering G.C. suffered as a child, when his father did have access to him, exemplifies the likelihood of future torture that we can prevent through granting CAT relief.

Finally, the record is unequivocal as to G.C.'s father's willingness and ability to follow through on his threats. The last time G.C's parents were together, his father beat and threatened to kill his mother, attempting to "stab [her in the eye] with a knife." G.C.'s father also hired two young women in Mexico and sent them to Guadalajara to "beat . . . up" G.C.'s maternal grandmother—G.C.'s only close relative still living in Mexico. The attackers relayed the message that G.C.'s father had "sent them [and] that he paid them money to go and beat her" to "retaliate against" G.C.'s mother.

That G.C.'s father may be motivated by many different reasons to target G.C. only bolsters G.C.'s CAT claim. G.C.'s brother stated that his father wants to kill G.C. because he "hates" him and has always viewed him as "stupid" and "slow." G.C.'s former girlfriend stated that his father wants to kill G.C. because he "thinks someone from his family called the police on him." G.C.'s mother testified

that his father would "seek vengeance" against G.C. "to retaliate" against her for not getting back together with his father. These multiple motives, rather than creating a "mixed record," underscore a clear desire by G.C.'s father to target G.C. for violence or death.[2]

## II.

G.C. has also demonstrated through extensive country conditions evidence and uncontroverted expert testimony that Mexican public officials are likely to acquiescence to future violence and torture by Los Zetas. "Public officials acquiesce in torture if they: (1) have awareness of the activity (or consciously close their eyes to the fact it is going on); and (2) breach their legal responsibility to intervene to prevent the activity because they are unable or unwilling to oppose it." *Barajas-Romero v. Lynch*, 846 F.3d 351, 363 (9th Cir. 2017) (citation and quotation marks omitted). Over a decade ago, we held in another case involving torture by Los Zetas in Mexico that "[m]any police officers are 'involved in kidnapping, extortion, or providing protection for, or acting directly on behalf of, organized crime and drug traffickers.'" *Madrigal v. Holder*, 716 F.3d 499, 507 (9th Cir. 2013) (quoting U.S. Dep't of State, 2008 Human Rights

---

[2] The majority spills considerable ink responding to a phantom argument about the "deemed-true-or-credible rule." That since-rejected rule posited that "'[i]n the absence of an explicit adverse credibility finding [by the agency], we must assume that [the alien's] factual contentions are true' or at least credible." *Garland v. Ming Dai*, 593 U.S. 357, 364 (2021) (citations omitted). That rule has no application here because the agency *expressly found* G.C., his mother, and his expert witness to be credible. What the majority characterizes as my "reweighing evidence" ignores that there is *no* reliable evidence in the record contradicting the testimony that G.C.'s father wants to kill G.C. and has *recently* threatened and targeted the family.

Report: Mexico (2009)).  We affirmed these conditions in 2020, noting that "extensive country conditions evidence indicat[es] the prevalence of acquiescence by public officials in the torture committed by Los Zetas generally . . . ." *Xochihua-Jaimes*, 962 F.3d at 1185.

The record in G.C.'s case demonstrates that these country conditions have not changed since our holding in *Xochihua-Jaimes* and Mexican public officials continue to acquiesce to Los Zetas' violent acts.  A 2018 State Department Human Rights Report reiterated the findings that some Mexican police officers at state and local levels are "involved in kidnapping, extortion, and providing protection for, or acting directly on behalf of, organized crime and drug traffickers."  G.C.'s expert witness, Dr. Robert Kirkland, testified that criminal-history information sharing between the United States and Mexico "basically warns the Mexican government of people [who] are returning that . . . have this kind of record and [of] former gang members, drug traffickers, et cetera."  Cartels such as Los Zetas have "informants within the police, within the security apparatus in Mexico and can access this data." Because G.C. has a criminal record and past gang involvement, Mexican government officials will "be aware of" G.C.'s deportation to Mexico, and Los Zetas—to include G.C.'s father—will have access to this information.  The IJ found Dr. Kirkland's testimony to be credible.

Relocation within Mexico will not mitigate the risk posed by Los Zetas and G.C.'s father, who resides in the vicinity of Tijuana.  The record states that "[t]he Mexican Defense Department [has] recognized [Los Zetas paramilitary men] as 'the most formidable death squad to have worked for organized crime in Mexican history.'" "[E]xtensive record evidence shows that Los Zetas operate

in many parts of Mexico, including states far away from Veracruz and surrounding areas." *Xochihua-Jaimes*, 962 F.3d at 1187 (internal quotation marks omitted). As in *Xochihua-Jaimes*, the record here depicts "torture, kidnappings, and murders by Los Zetas in numerous states throughout Mexico." *Id.*

The majority acknowledges that Los Zetas has "a strong presence in about 17 Mexican states—or half the country," but as we recognized in *Xochihua-Jaimes*, "[n]either the IJ nor the BIA cited any evidence that there are states in Mexico where Los Zetas are *unable* to operate." *Id.* (emphasis added). As Dr. Kirkland testified, Los Zetas "certainly can leverage . . . their informants within the Mexican security apparatus to be able to find out where [G.C.] lives in Mexico." He further testified that it will be "difficult [for G.C.] to hide" or "go to anyplace in Mexico and not have . . . the cartels know where [he] live[s]." As a member of Los Zetas cartel, G.C.'s father can locate and target G.C. for violence anywhere in Mexico with the cooperation or acquiescence of Mexican public officials. Removing G.C. to Mexico collocates him with his abuser, a man who possesses the intent, the capability, and now a newfound opportunity to torture and kill G.C.

* * *

For the foregoing reasons, I would grant the petition and remand for the agency to grant deferral of removal pursuant to CAT because the record compels the conclusion that Petitioner will more likely than not be tortured if removed to Mexico. *Xochihua-Jaimes*, 962 F.3d at 1188; *see also Haile v. Holder*, 658 F.3d 1122, 1133 (9th Cir. 2011) ("Because the evidence [petitioner] presents compels but one conclusion and is unrebutted, there is no reason to remand in

this case—we hold that [petitioner] is entitled to deferral of removal under the CAT.").